## Elmendorf v. Commonwealth.

(Decided October 11, 1916.)

### Appeal from McCracken Circuit Court.

1. Criminal Law—Accomplices—Accessory.—An accomplice in the commission of a crime may be a principal, an accessory before the fact, or an aider and abettor, but an accessory after the fact is not an accomplice within the meaning of section 241, criminal code.

2. Criminal Law—Accessory.—Mere knowledge that a crime has been committed does not constitute one an accessory after the fact, because he fails to reveal his information—he must harbor a felon or render aid and assistance to him in escaping the consequences of his crime before one becomes an accessory after the fact.

3. Criminal Law—Accomplices.—Mere knowledge that a crime is intended to be committed, in the absence of any duty to prevent it, and a failure to perform the duty, does not make one an accomplice. A person must participate in a crime before he can be an accomplice, or when a duty rests upon him to prevent a crime and having knowledge of its intended commission, fails to prevent it, when he could do so.

4. Criminal Law—Evidence—Maps—Photographs.—Maps, models, sketches, pictures and photographs are not admissible in evidence in proof or illustration of facts, until proof is made that they are true representations of the objects, which they purport to represent. Before pictures or photographs are admissible in evidence it must appear that they are illustrative of some fact and substantially necessary for the purpose.

5. Criminal Law—Appeal and Error.—The Court of Appeals will not reverse a judgment because the verdict of the jury upon which it is based was made upon contradictory evidence, where there is no prejudicial error of law appearing upon the record. The verdict of the jury will be disturbed, only, when it appears to be palpably against the weight of the evidence.

SAMUEL H. CROSSLAND for appellant.

M. M. LOGAN, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

The appellant, Ernest Elmendorf, was convicted in the McCracken circuit court, of the crime of wilful murder, and his penalty fixed at imprisonment during his lifetime. The motion made by him for a new trial having been overruled by the circuit court, he has appealed to

this court.   The evidence heard by the trial court pre-
sents many contradictions, and facts, which are unusual.
On the night of February 2nd, 1916, Al Redman, Pete
Ingram and Dick Iseman were in the saloon owned by
Theo. Peters, on Kentucky avenue, in the city of Pa-
ducah.   The front of the saloon was upon Kentucky
avenue, between 10th and 11th streets.   There was
a side door to the saloon, upon the west side of it, which
opened out upon an alley which extended from Kentucky
avenue to Broadway.   The side door was composed, in
part, of glass, which had once been friezed over with
a substance which prevented a view through the glass,
but at the time in question, this substance had rubbed
off to such an extent, that enabled any one to see through
the door.   To the west of the saloon, a restaurant fronted
on Kentucky avenue, and the building in which the
restaurant was kept extended in the direction of Broad-
way.   The room next to the restaurant was unoccupied,
but the two following rooms in the building were occu-
pied by William Malone, who lived there alone.   The
door by which Malone entered the rooms   occupied
by him opened upon the alley, which extended from
Kentucky avenue to Broadway, and at a distance of
from fifty to seventy-five feet from the side door of the
saloon, which opened upon the side of the alley.   A
fence extended alongside the saloon between it and the
alley, but there was an opening in the fence, four feet
in width, at the side door of the saloon, which permit-
ted egress from the alley to the side door of the saloon.
On the night of February 2nd, at about fifteen to twenty
minutes after ten o'clock, Al Redman, who was the bar-
tender in the saloon, was engaged in the rear end of the
room in which the saloon was kept, and Pete Ingram
and Dick Iseman were sitting, engaged in conversation.
Iseman's back was toward the side door of the saloon.
Just at this time the side door opened and a man, who
appeared to be about five feet and ten inches in height,
and about one hundred and thirty-five to one hundred
and forty pounds in weight, came into the   saloon
through the door.   The intruder had a toboggan cap,
gray in color, with two red bands encircling it, and with
holes cut in it to permit his seeing.   The cap was drawn
over his head so as to obscure his features, except his
eyes, which were brown in color.   No perforations were
made in the cap for his nose or mouth.   He had a large

pistol, apparently a No. 45 single action Colts, in his hand. He immediately presented the pistol at Redman, with a command for him to throw up his hands and to back up to the register, in which the money in the saloon was kept. When Redman realized the situation, he held up his hands and proceeded to do as directed. The intruder then commanded Ingram and Iseman to throw up their hands, and Ingram instantly obeyed, but Iseman, who had but one arm, started toward his assailant, extending his arm toward him, with the declaration, that he would not throw up his hands to any one. The robber then discharged his pistol at Iseman, giving him a mortal wound, from which he died in a few minutes. The robber then said: "That is what a d—d fool gets for resisting," and warned Redman that if he resisted, he would kill him, too. He then required Redman to hand to him a No. 38 Smith & Wesson hammerless pistol, which was in a drawer, and to place the drawer of the register within his reach, from which the robber took the money it contained, and then immediately departed out of the side door, taking with him the money and the No. 38 Smith & Wesson pistol. The robber was, further, described as being dressed in a brown coat, and having a long, slender hand, with no indications of having been employed in manual labor, and with fingers one-fourth of an inch in length greater than the fingers of Al Redman, and with having a coarse voice, but the sound of it was obstructed by the cap over his face.

Evidence was heard to the effect, that between 10:35 p. m. and 10:40 p. m., the appellant, Elmendorf, came into the front of the saloon, and there appeared to be talking over the telephone, which was there, and inquired of Redman what had happened, and when told that Redman had been robbed and Iseman killed, he did not go back to or make any inquiry in regard to Iseman, although he was an acquaintance, but went immediately out of the saloon. On the morning of the day following, Malone was summoned by the police to the city hall to be interviewed by the chief of police. He went to the city hall, but the chief of police not being there, he returned to the saloon or to his home. He was then arrested upon suspicion of having knowledge of the crime or of some connection with it and confined in jail. Upon the advice of his nephew and his attorney, he then, as he claims, revealed his knowledge of the perpetration

of the crime. His statement implicated the appellant as the perpetrator of it, and he was then arrested and indicted for the crime.

The indictment contains four counts. The first count charges that the appellant, together with other persons, whose names are to the grand jury unknown, killed Iseman. The second count charges that the killing was done by a person whose name is to the grand jury unknown, and that the appellant was an accessory before the fact to the crime. The third count charges the actual killing of Iseman to have been done by a person to the grand jury unknown, and that appellant was an aider and abettor of such unknown person in the commission of the crime. The fourth count charges that appellant conspired with another person or persons, whose name or names are to the grand jury unknown, to kill and murder Iseman, and that in pursuance and furtherance of the conspiracy, Iseman was killed by one of said persons. To this indictment the appellant plead not guilty.

The instructions to the jury related to the guilt of the appellant, as charged in the first and third counts of the indictment, only. The instructions, in substance, directed the jury, that if it should believe from the evidence, to the exclusion of a reasonable doubt that the appellant, or he together with another person or persons, whose names were unknown, did feloniously, wilfully, and with malice aforethought kill Iseman by shooting him in the manner described in the indictment, and by reason of which he immediately died; or if it should believe from the evidence, to the exclusion of a reasonable doubt, that a person, whose name was unknown, feloniously, wilfully, and with malice aforethought, shot Iseman, with etc., from which he immediately died, and believed from the evidence, to the exclusion of a reasonable doubt, that the appellant was then and there actually or constructively present, feloniously and with malice aforethought, aiding, abetting, and assisting such other person in the shooting and killing of Iseman, to find him guilty.

It will be observed that the instruction permitted appellant to be convicted, only, in the event that he did the killing either alone or with the assistance of others, or in the event that some other person actually did the killing and appellant was an aider and abettor of such person in so doing.

By the other instructions given, the terms malice aforethought and aforethought, and the terms actually present and constructively present were defined; and an acquittal directed if the jury entertained a reasonable doubt of the appellant having been proven to be guilty.

The grounds upon which a reversal of the judgment is now sought are:

(1) The court erred to the prejudice of appellant in excluding certain things, alleged to be evidence, and in permitting incompetent and irrelevant matters to be given in evidence before the jury.

(2) The court erred to the prejudice of appellant in instructing the jury, and in failing to give certain instructions to the jury.

(3) The court erred to the prejudice of appellant in overruling his motion for a new trial.

For the purpose of determining the soundness of the contentions of appellant it is necessary to set out in detail the statements made by certain witnesses, upon whose testimony depends the rulings sought to be invoked.

The witness, William Malone, in substance, testified that he had a personal acquaintance with the appellant, which began about the month of August, 1915, but had known him by sight for some years theretofore; that Harry Keiley conducted a saloon in the room occupied by Peters as a saloon for some time previous and up to about the first of January, 1916; that he, witness, had a lunch stand in the room while Keiley had the saloon there, and that appellant was about and in and out of the saloon nearly every day while Keiley was engaged in the business there; that about the month of December, 1915, a robbery was committed on Broadway and appellant was arrested on account of it; that appellant thereafter said to him, at his lunch stand, that Al Redman was the cause of his arrest, and that he would get even with him, if it took five years in which to do it; that he was agoing some time to "hold up" Redman, and take his money and make him give up and take his pistol; that after Keiley quit the saloon business, that witness continued to occupy the rooms in the rear of the restaurant, and on the other side of the alley from the saloon; that Peters, with Al Redman as his bartender, opened a saloon in the place formerly occupied

by Keiley in January, 1916; that after Keiley ceased to conduct the saloon, that he and appellant were at his (Malone's) rooms every day; that Dutch Dicke, Joe Yeiser, Greenleaf and Thurman, also visited his rooms frequently. Keiley, appellant and Dutch Dicke were at his rooms every day for a month after Keiley ceased to conduct the saloon; that upon the day upon which Iseman was killed, Keiley, Joe Yeiser, Dutch Dicke, Greenleaf, Thurman and appellant came to his rooms, about three o'clock p. m., and remained until about seven o'clock p. m.; they were engaged in drinking and, also, talking about pistols; they had pistols of several kinds; that appellant had a large pistol, which looked like a No. 45 Colts; Keiley and Greenleaf left together; appellant and Joe Yeiser then had a private conversation, which lasted for twenty or thirty minutes, and then went away together; in about twenty minutes appellant returned and asked witness for the loan of a bowl, which appellant took out, and in a few minutes returned with it filled with soup, which he ate; about the time appellant finished eating the soup, Dutch Dicke came in and gave witness a coffee cake; Dutch Dicke and appellant then went away; appellant returned about ten o'clock p. m. and had under his arm or under his coat a gray toboggan cap, with two red stripes on it, which he laid down upon the side board; witness inquired of him what he was going to do with that; appellant said: "You know what I have been telling you about Al Redman, we are going over tonight and take his money." Witness said to him, that you will get into trouble or get killed; appellant said: "There is no danger of getting killed: all you have to do is to get their gun and tell them to throw up their hands, and if they are slow about it, all you have to do is to shoot, then get the money and get out the door;" appellant pulled the cap over his head and face; it had holes for his eyes, nose and mouth; he had on a brown looking coat, and a large pistol in his right hand coat pocket; he stepped out the door and said: "We are going over to get Al's dough." In ten, fifteen or twenty minutes witness heard a shot fired, and went to his door and heard appellant coming through the opening in the fence at the side door of the saloon; he ran down the alley and threw the cap into witness' open door; he turned to his right and ran through a vacant lot towards the old skating rink, and when he

got there two or three other men joined him and ran
off with him; witness could not see the men, but heard
them; witness picked up the cap and threw it in the fire,
which consumed it, and after a time went to bed; the
next morning the witness was told to go down to the city
hall and talk to the chief of police; he went, but did not
see the chief of police; he came back to his rooms, and
about seven o'clock a. m., the appellant came in and in-
quired for the news; he told appellant that Redman had
been robbed and Iseman killed; appellant said that he
heard that down in town; he asked witness if any officers
had been there and if they had asked anything about
him; witness told him that Thad Terrill had been there
and asked a good deal about him; asked when appellant
had been there and when he had gone; appellant said,
"d—n Terrill, that he could not do anything to him,
that Terrill had done things in this town that would
send him over the road;" appellant left and was gone
about three hours, when he returned and said that he
had seen Terrill and told him what was what: that Ter-
rill had become very friendly and that he, appellant, had
made him spend two dollars at the bar; that evening ap-
pellant returned, told witness that he must not divulge
anything and that if he did, that he would kill him; that
appellant had friends at St. Louis and elsewhere, who
would kill the witness, if he did not; the next day appel-
lant was at the rooms of witness and told him that Al
Redman was talking mighty big about the thing, and
when this blows over, that he was going to "stick him
up" for his diamonds; that he, witness, was troubled
and did not know what to do; that he burned the cap,
because he did not want it. The witness, Malone, was
contradicted by appellant, who denied that he was at
Malone's rooms after he left with Yeiser, at near six
o'clock on the day before the killing of Iseman, or that
he ate a bowl of soup there, but Dutch Dicke testified
that after he returned from his supper to Malone's
rooms, that appellant and Malone ate a bowl of soup.
The parties whom Malone testified were at his rooms on
the afternoon before the murder, substantially corrobo-
rated Malone in his statements, in reference to their
movements. It is, however, proven by Dutch Dicke,
Yeiser, Thurman and Greenleaf, that on the morning
following the murder, that Malone made statements to
them to the effect, that he was in bed and knew noth-

ing of the case. Malone does not really deny that he
made such statements, but says that he may have done
so. No other witnesses, except these parties, however,
make any statements contradictory of Malone.

Jennie Dobbs, in substance, stated, that about ten
o'clock p. m., she was on Kentucky avenue, and heard
a pistol discharged and immediately thereafter saw
three men coming from the side door of the saloon into
the alley and run away.

Joe Lambert saw two men, about 10:30 p. m., come
out from the old skating rink place upon Broadway, be-
tween 10th and 11th streets, go up Broadway and turn
down 9th street, and when they got to Kentucky avenue,
one of them turned down the avenue toward the Peter's
saloon, and the other crossed over the avenue, and when
witness came near him, he left the sidewalk and went
out into the street. The latter man resembled appellant
in size and height.

Horace English and Jim Poore testified that previous
to the killing they saw appellant with a No. 45 Colts
pistol.

Appellant's defense was an alibi. He claimed that
he left Malone's room ten minutes before six o'clock,
and went to the Klondyke saloon, kept by Clem Fran-
ciola; that he left there five minutes before eight o'clock
and went to the city hall, at the request of Thad Ter-
rill, the night captain of the police; that he left the city
hall about half past eight o'clock, and went to Jean
Thompson's saloon, where he remained playing cards,
and looking at others play until about eleven o'clock,
when a negro came in and told them of the tragedy at
Peter's saloon; that he called Terrill on the telephone
and learned from him of the murder of Iseman; that
Terrill requested him to get out and assist in finding
the perpetrator of the deed; that he went from there to
Peter's saloon and from there to Mitchell's saloon,
where he put his watch in pledge for fifty cents; then
took a taxicab for the Union railroad station and
inquired about the outgoing trains, and then went
home, where he arrived after midnight, and was at Ma-
lone's rooms the next morning at 9:30 o'clock. In this
statement and the details of it he was more or less cor-
roborated by several witnesses. The appellant, also, at-
tempted to show by proof that one Kistener was the
party who robbed Redman and killed Iseman. On the

night of the 17th of March, 1916, at about ten o'clock, Kistener entered the saloon of one Oscar Schmidt, in Paducah, and attempted to rob him, when Schmidt shot and killed him. Kistener was shown to have been wearing at the time a brown coat; that he was about five feet and ten inches in height and weighed about one hundred and thirty-five or one hundred and forty pounds. He had eyes, which the witnesses described as brown, very dark, and black. He had in his hand at the time he was shot a No. 38 Smith & Wesson hammerless pistol, similar to the one which the slayer of Iseman took from Redman, except the one had by Kistener had a mark upon it, which Redman's pistol did not have, and a screw was gone from it, which Redman's pistol had. He, also, had upon his person a No. 45 single action Colts pistol, similar in appearance to the pistol which Iseman's slayer made use of. Kistener, also, had a long, slim hand, such as the slayer of Iseman had, but there was proof to the effect that his hand was longer than the hand which slew Iseman and not so broad.

In the examination of Malone he was asked and permitted to state, without objection from the appellant, that he had seen the appellant and Kistener in company with each other previous to the death of Iseman; that he had seen them come in to Kelley's saloon together. Before closing its evidence in chief, the attorney for the Commonwealth introduced witnesses, who testified without objection from appellant, that Kistener was at the home of his mother from eight o'clock p. m. upon the night that Iseman was killed until the next morning. The appellant introduced witnesses, who testified that the witnesses, who proved that Kistener was at his mother's home when Iseman was killed, had made statements immediately after the occurrence, that Kistener came to his mother's home at some time during the night, but that they did not know when. When the appellant was testifying in chief, he testified that he was not acquainted with Iseman; that he had never seen him; that he was never in his company at any time, and had never heard of him until after his death.

(1) Upon the trial, Redman testified that the man who killed Iseman had fingers, which were one-fourth of an inch greater in length than his, Redman's, fingers. The attorney for appellant then requested Redman to extend his hand upon a sheet of paper, and then with a

pencil described the shape, length and size of Redman's hand upon the paper by apparently drawing a line with the pencil around the contour of his hand. He then, after recalling appellant to the witness stand, made a similar drawing of his hand upon another sheet of paper. Then, after other lines were drawn upon the sheets and figures written upon them, which purported to give the relative width and lengths of the hands, they were offered as evidence, tending to show that Redman's fingers were longer than appellants, and for that reason appellant was not the slayer of Iseman. The court refused to allow the drawings to be received as evidence. After the statement made by Redman, it was beyond question proper for appellant to show in any proper way that he could, that his fingers, instead of being longer, were shorter than Redman's, as it would tend to prove that he was not the perpetrator of the crime. It is apparent, however, that to undertake to prove such fact by the introduction of the drawings offered was not the proper way to do it. To have permitted their introduction would have violated the rule, which required the best evidence of a fact, in all cases, to be used. The hands of both appellant and the witness were in existence, and in the presence of the court and jury, and there was no necessity for a drawing or picture of their hands to demonstrate which had the longer fingers. Maps, diagrams, models and sketches may be received in evidence for the purpose of showing representations of things, which cannot be as conveniently and clearly described by witnesses. A picture or photograph may be used for the purpose of describing a person, place or thing whenever it is important or relevant to do so, but maps, diagrams, models, sketches, pictures and photographs offered in evidence must first be proven to be correct and true representations of the things which they purport to represent before they are admissible as evidence. McCandless v. Com., 170 Ky. 310; L. & N. R. R. Co. v. Brown, 127 Ky. 732; 17 Cyc. 415. A drawing of the hands of appellant and the witness for the purpose of demonstrating their lengths could only be secondary evidence and not admissible, unless the use of such drawing was practically illustrative of that fact and substantially necessary to prove it. The witness was required to and appellant was permitted to exhibit his hand to the jury, which could then make the com-

parison, without the aid of a sketch of either of their hands. It is not intended to hold that an exhibition of their hands was the only proper way to show the comparative size of their hands, but no other way was sought by appellant, except the exhibition of the drawings, which were not proven to have been correct measurements, and therefore not admissible. Besides, upon the purported drawings of their hands, in addition to the sketches, were other lines made by the draughtsman and figures written thereon purporting to show the comparative length and width of the hands, which lines and figures were without any supporting testimony of their correctness.

(2) Complaint is, also, made, that after the Commonwealth's Attorney had, while introducing the evidence in chief for the state, offered witnesses who gave testimony to the effect that upon the night upon which Iseman was killed, that Kistener was at his mother's home, and therefore could not have been the slayer of Iseman, and then after the testimony of appellant, in chief, had been heard, that the Commonwealth's Attorney was permitted to introduce Stevens, Cooper and Seay, each of whom testified to having seen appellant and Kistener in conversation with each other previous to the death of Iseman. If it had been attempted for the Commonwealth to show that Kistener was the actual slayer of Iseman, then it seems that the evidence of Stevens, Cooper and Seay would have been competent, as tending to prove that appellant was an aider and abettor of him in the crime and therefore guilty under the third count in the indictment, but the position of the prosecution, under the evidence offered for it, being that Kistener was neither the principal nor an aider or abettor in the crime, it was immaterial whether appellant was acquainted with him or had engaged in private conversations with him just preceding the murder, and the proof of such facts was irrelevant, but the appellant made no objection to the testimony of these witnesses, cross-examined them at length, and requested the court to instruct the jury to the effect, that it should not consider the evidence of one of them for any purpose, except to the extent that it might affect the credibility of appellant as a witness, if it did have such effect. The court in compliance with this request, so instructed the jury, and did likewise in the case of the other two, with-

out any specific request from the appellant for that purpose and without any objection from appellant. Under these circumstances, he cannot now complain of the admission of their testimony.

(3) It is contended for appellant, that the testimony of Malone tended to prove that he was an accomplice of appellant in the murder of Iseman, and that the court erred to the prejudice of the substantial rights of appellant in failing, by an instruction, to submit to the jury as a question of fact whether or not Malone was an accomplice; and in failing to instruct the jury, if it found from the evidence, that Malone was an accomplice in the commission of the crime, that it should not find appellant guilty upon the testimony of Malone, unless it was corroborated by other evidence tending to connect appellant with the commission of the offense; and that the corroboration was not sufficient if it merely showed that the offense was committed and the circumstances of it, as provided by section 241, of the Criminal Code. The law pertaining to the duty of the court where the testimony of an accomplice is relied upon for a conviction is well settled. If the testimony of the accomplice is uncorroborated it is insufficient to sustain a conviction of a crime. The corroborating evidence must tend to connect the accused with the commission of the crime. Corroborating evidence, which merely shows that a crime has been committed and the circumstances of it, is insufficient. Where upon the evidence, as a matter of law, the court cannot hold that the witness was an accomplice of the accused in the commission of the crime it is a question to be determined by the jury upon the evidence, under proper instructions of the court. If the jury is of the opinion that the witness was an accomplice, it should acquit the accused, unless the corroborating evidence exists. Bowling v. Com., 79 Ky. 606; Smith v. Com., 148 Ky. 69; Deaton v. Com., 157 Ky. 308. Where the evidence justifies it, the court should instruct the jury in accordance with the views above expressed, and to fail to do so would be prejudicial error. The determination as to whether or not Malone was an accomplice of the appellant in the murder of Iseman will determine whether the court was in error in failing to give the instructions about which the appellant complains. In arriving at the conclusion of the status of Malone, it is only necessary to examine his own evidence, as no other

witness in any way connected him with the crime. We have set out the evidence of Malone with particularity, and it is unnecessary to reiterate it here. An accomplice is a term which may include within its meaning any one who takes part in the commission of a crime. A principal, an accessory before the fact, or an aider or abettor is an accomplice. Russell on Crimes, Sec. 26. If a judgment of conviction can be sustained upon the evidence against one as a principal, an accessory before the fact, or an aider or abettor of a crime, such person is an accomplice. If such conviction cannot be sustained, such person is not an accomplice. Levering v. Com., 132 Ky. 666. It is an old rule of the common law, that one cannot be guilty of a crime unless he takes a part in its commission, or owes a duty to the one upon whom the crime is committed to prevent it and fails to do so, when he could. Mere knowledge that a crime is going to be committed, in the absence of a duty to prevent it, does not make one legally guilty of any participation in it. The conduct of Malone in failing to give warning of the crime threatened by appellant was reprehensible, but he was under no legal duty to Redman to prevent it. The mere knowledge that a crime has been committed and a failure to tell of it does not make one an accessory after the fact. To be an accessory after the fact one must harbor a felon or render him some assistance to escape punishment. Malone neither advised nor assisted nor encouraged appellant in seeking to rob Redman, which act resulted in the murder of Iseman. Hence, he could not be a principal in the crime, an accessory before the fact, nor an aider or abettor in it. It is insisted that because he burned the cap, which he says appellant threw into his door, that he was thereby assisting appellant in the commission of the crime and was an accomplice. This occurred after the crime was committed, and if it be conceded that Malone destroyed the cap for the purpose of concealing material evidence against appellant and to assist him in evading the punishment of the law, it was an act of an accessory after the fact. It has been expressly held by this court that an accessory after the fact is not an accomplice within the meaning of section 241, of the Criminal Code. Levering v. Com., *supra.* If there is not some evidence conducing to show that a witness is an accomplice, it is not proper to submit the question as to whether he is

an accomplice to the jury, nor to give the instruction provided for in section 241, of the Criminal Code. Hence, there was no error in failing to give an instruction upon the subject, in the instant case.

(4) The affidavits of the persons who testify that Lizzie Stevens made statements, which are contradictory of the statements made by her upon the trial, do not constitute a valid ground for a new trial. The evidence of Lizzie Stevens was only permitted, by the instructions of the court, to be considered as a contradiction of the testimony of appellant, to the extent that it might affect his credibility as a witness, and this court has repeatedly held that a new trial will not be granted for the purpose of enabling the party applying for it to impeach a witness. When newly discovered evidence merely tends to impeach a witness, it is not regarded as decisive in character sufficient to authorize a new trial. Knipp v. Com., 159 Ky. 775; Deaton v. Com., 157 Ky. 308. In the instant case, Malone, Cooper and Seay made similar statements to the Stevens woman, and it cannot be seen how an impeachment of her alone would create any probability of a different result to a new trial from the result in the one complained of.

(5) The contention that a new trial should have been granted because the verdict of the jury was palpably against the weight of the evidence cannot be upheld. The evidence of appellant's guilt was sufficient to require a submission of the case to the jury. While the evidence which tended to prove an alibi for appellant was strong, it and the evidence for the Commonwealth conflicted seriously as to the whereabouts of appellant at the time of the murder and immediately thereafter. The jury is the judge of the credibility of the witnesses. The witnesses were before the jury and it had the opportunity to observe their manner, appearance, intelligence, and apparent truthfulness, which we have not. It arrived at the conclusion that the appellant was guilty of being a principal in the commission of the crime. The weight of the evidence is always a question for the jury. We cannot set aside its finding because it has believed one set of witnesses and not another. We will not disturb the finding of the jury when the evidence is contradictory, when the accused has had a fair trial, on the ground that the weight of the evidence is against the verdict. Such a course would make this court the trier

of the issues of fact in every criminal case. The rule now is, that we are warranted in disturbing the verdict of the jury, only, when the verdict is palpably against the weight of the evidence. The verdict, herein, is not so palpably against the weight of the evidence as to warrant an interference by the court. Knipp v. Com., 159 Ky. 775; Jones v. Com., 158 Ky. 533; Black v. Com., 154 Ky. 144; Hinton v. Com., 134 Ky. 511; Conners v. Com., 152 Ky. 57; Rutland v. Com., 160 Ky. 77.

The instructions fairly presented the issues to be tried.

There is no error of law appearing upon the record, which prevented appellant from having a fair trial, and the judgment is therefore affirmed.