## Lambdin v. Commonwealth.

(Decided June 2, 1922.)

### Appeal from Whitley Circuit Court.

1. Criminal Law—Evidence—Credibility.—A verdict of guilty which is supported by the testimony of two eye-witnesses introduced by

the Commonwealth may not be said to be flagrantly against the evidence where defendant and three other witnesses, two of whom were his brothers and the other his first cousin, testified to the contrary; since the question is not determinable alone by the number of witnesses testifying for or against the issue, and the jury may disbelieve one set of witnesses though greater in number than the other and accept the testimony of those testifying to the contrary though in the minority, unless perhaps the majority is so great as to force the conclusion that those testifying to the contrary were necessarily mistaken, or intentionally falsified, but proven circumstances bearing upon the issue the one way or the other will be considered and given due weight.

2.   Criminal Law—Voluntary Manslaughter—Instructions.—A homicide committed by the wanton, reckless or grossly careless handling or discharge of firearms, in a way, which the user knows is dangerous to human life, is voluntary manslaughter, although the user has no intention to kill, and instruction 11a in this case submitting the issue of voluntary manslaughter under such circumstances was not erroneous as confusing in its structure; nor was it error under the facts of the case to give an instruction on voluntary manslaughter committed under heat and passion or upon provocation.

3.   Criminal Law—New Trial—Newly Discovered Evidence.—Even if the necessary diligence is shown a new trial will not ordinarily be granted upon the ground of newly discovered evidence where it is cumulative or impeaching in its nature; however, if it is so convincing that it would be likely to produce a different result a new trial will be granted though it be of the nature indicated; but in this case the record does not disclose the alleged newly discovered evidence to be of such convincing nature.

STEPHENS & STEELY for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Lee Partin, a boy about seventeen years of age, was shot and killed in the residence of Robert Lambdin, a brother of appellant, Grant Lambdin, in Whitley county between eight and eight-thirty p. m. on December 22, 1921. Appellant was indicted by the grand jury of the county charging him with the homicide and at his trial he was convicted of the offense of voluntary manslaughter committed by the reckless and grossly careless handling of a pistol when he had reasonable grounds to know that it "was dangerous to life in the way and manner he was using it," and while so doing he shot and killed the de--

ceased. His punishment was fixed at nine years' confinement in the penitentiary and the court, after overruling his motion for a new trial, pronounced judgment on the verdict, to reverse which he prosecutes this appeal.

The grounds urged by his counsel for a reversal are (1), that the verdict is flagrantly and palpably against the evidence and was the result of passion or prejudice on behalf of the jury; (2), error of the court in admitting evidence over defendant's objections; (3), erroneous instructions, and (4), newly discovered evidence material to the defense, each of which will be disposed of as briefly as possible in the order named.

1. Defendant was twenty years of age and had been married but a short while and his wife was teaching the public school in the district in which they lived. They resided at the home of defendant's father, and his brother, Robert Lambdin, who was also married, lived in a one room cabin about four hundred yards away. Evan Lambdin, another brother, and William Siler Lambdin, a first cousin, lived in the state of Oklahoma but they were each visiting in the neighborhood at the time and had been for something like six weeks. The non-resident brother had his suit case at the home of Robert, whose wife was away on that night and no one expected to occupy the house except the husband, the parties having no children. It was on Thursday and defendant's wife closed her school on that day for the approaching holidays, and as was customary in that vicinity she treated the pupils. The deceased, Lee Partin, who is a first cousin of defendant and also of the deceased, Garrett Partin, who is likewise a first cousin to defendant, went home with the school teacher after she dismissed her school, and they arrived at the home of the elder Lambdin where she and her husband resided at about four o'clock p. m. Those of the family who were present together with the two visitors had supper at the usual hour and shortly thereafter the defendant and his brother, Evan, arrived. Discovering the presence of the company the two brothers concluded that they would procure a chicken for breakfast the next morning and they left the house for that purpose, although there were chickens on the place but defendant said they were too poor to eat. They finally found a suitable one and returned later and had their supper. While away hunting for the chicken they ran across Chester Hamblin, another cousin of defendant, and Wil-

liam Siler Lambdin, who had a half gallon and a quart of moonshine whiskey which was in separate receptacles. Defendant purchased the half gallon and in returning home he deposited it by the side of the road in a bunch of apple tree sprouts. Evan Lambdin was intending to go to Jellico early the next morning to take the train back to Oklahoma, and others of the party, including defendant and his wife, also expected to take the same train to make holiday visits. Evan had left his grip or suit case at his brother Robert's house and in order to be ready for the early trip next morning he suggested a short while after he and defendant had eaten their supper that he would go to the home of his brother Robert and procure it. Defendant proposed to go with him and requested the deceased and Garrett Pardin to go also, which they finally did. On their way they stopped at the apple tree sprouts and paid their respects to the jug deposited therein. When they arrived at Robert's they found him there and also Chester Hamblin and William Siler Lambdin. There was only one chair in the room which some one of the party occupied, while others sat on one of the two beds in the room, defendant, as it seems, standing up and walking about the room the most of the time. One of the doors in the room was almost immediately beside the jamb of the fireplace and at that spot the deceased seated himself on the floor while Chester Hamblin sat immediately next to him on an empty tin lard can. There was a dresser in the room and a small table sitting against it. Mrs. Robert Lambdin, as stated, was not at home. Evan mentioned that he would get his grip from under one of the beds and take it to his father's and shave so as to be ready early the next morning to start on his trip home. Robert suggested that he shave there, which was agreed to and the latter chunked up the fire to heat some water in a teakettle with which the shaving could be done. In the meantime Robert pulled off his coat and laid his 45 calibre automatic pistol on the dresser and commenced playing a French harp. About that time Chester Hamblin asked William Siler Lambdin to pass around the fruit jar containing a little more than a pint of moonshine whiskey, which was done, but it is disputed as to who took a drink, but we think from the facts and circumstances that every one in the house did so except Robert. Just before the drinking, or about that time, Chester Hamblin drew his pistol, which was a 38 special, and waived it pro-

miscuously around his head and pointed it in different directions, but he did no shooting at that time according to the testimony of all the witnesses. He was urged by those present, including defendant, to put his pistol back in his pocket, which he did. While Chester had out his pistol he "'lowed" that he was the meanest man there, which Evan Lambdin, being envious of the assumed distinction, disputed by saying that "when it came to the principle of the thing he was the meanest man there," but Chester retaliated by admitting that while that might be so he was the nerviest man there.

Up to this point the witnesses for both the Commonwealth and the defendant agree, except there is contradiction about who did and who did not take a drink in the house, to which we have before referred. Chester Hamblin and Garrett Partin, the only eye-witnesses introduced by the Commonwealth, testified that shortly after Evan Lambdin laid his pistol on the dresser the defendant picked it up and fired two shots in the door above the head of deceased who, as stated, was sitting on the floor at the bottom of the door, and that in a second or so he fired another shot in the direction of the deceased which struck him somewhere in his leg and ranged up it and entered his bowels, from the results of which he died in a few hours. Those witnesses say that defendant was several feet away from the deceased at the time of the shooting, but the map used on the trial is not brought here and we are unable to fix the distance. They also say that Chester Hamblin, as soon as he discovered deceased was shot, said to defendant, "I would be damned ashamed of myself that I had shot this poor boy and perhaps killed him," and that the deceased immediately arose and said, "Boys, I'm shot, put me on the bed."

Besides defendant, the eye-witnesses who testified in his behalf were his brothers, Evan and Robert Lambdin, and his cousin, William Siler Lambdin, and they testified in substance that after Chester Hamblin took his drink and after he had put his pistol in his pocket he left the lard can upon which he was sitting and went to the table by the dresser upon which was sitting a pitcher of water and took what the witnesses say was a "chaser;" that he immediately picked up the 45 calibre pistol belonging to Evan Lambdin and fired two shots in the door above the head of deceased and again took his seat on the lard can and then fired the third shot which struck and

killed the deceased, and at that time the muzzle of the pistol was not exceeding between six and ten inches from the deceased and perhaps closer; that the deceased immediately arose and said, "Chester, you have shot me," and asked to be and was placed on one of the beds where he shortly thereafter died. They, of course, denied all of the testimony of the two witnesses for the Commonwealth as to the defendant doing the shooting in the manner they described. At this point the witnesses again agree and said that Robert and Evan Lambdin and the defendant immediately left the house after deceased was put upon the bed and did not return at any time thereafter. The three brothers say that they went to the home of a neighbor and had him to notify the father and relatives of the deceased; that they then returned to the scene of the homicide but immediately left and procured some one to send for a physician who did not arrive before the death of the deceased. They did not go into the house after they returned because they say that an uncle of deceased had arrived and they apprehended that he was so angered that he would produce trouble, although it is not explained by them why that uncle, or even the father of deceased, would conclude that either of the Lambdin brothers had done the shooting. The three went to the home of their father, where defendant resided and procured some quilts and went into the mountains where they spent the night sleeping under a cliff and remained there for the larger part of the next day. Robert carried along with him the pistol with which deceased was killed. They spent the following night at the home of a friend, and afterwards defendant surrendered to the officers, having learned that a warrant had been issued for him. Neither of the three told their father what had happened, although the killing had occurred in the home of his son, Robert. We, therefore, have the testimony of the two eye-witnesses for the Commonwealth who were first cousins of defendant as to how the killing occurred, contradicted by defendant, two of his brothers and another first cousin. If there were no other facts or circumstances in the case it could scarcely be said that the verdict of the jury, which accepted the testimony of the Commonwealth's witnesses as true, was flagrantly against the evidence, or that it was the result of passion or prejudice, for we have often held that a verdict based upon the testimony of a minority of the witnesses who testified as to the facts would not render it flagrantly against the evi-

dence, since it is the province of the jury to sit in judgment upon the credibility of the witnesses.

But there are some uncontradicted circumstances in the case which strongly fortified the testimony of the Commonwealth's witnesses, one of which is that defendant and his two brothers left the scene with their cousin mortally wounded and lying upon the bed, and that upon merely a supposed apprehension of danger they fled into the mountains when, so far as appears from the record, no one pursued them, nor, according to their testimony, was their any fact or circumstance justifying such pursuit. They did not tell their father of the terrible tragedy in which, as they say, they performed no guilty part. Still another circumstance is, that if Chester Hamblin did the shooting, as defendant and his witnesses describe, it is peculiarly strange that he did not do so with his own pistol which he had but recently put in his pocket, and if he had fired the fatal shot with the 45 calibre pistol with the muzzle within a few inches of the deceased, as defendant and his witnesses testified, there certainly would have been the signs of powder burn upon the clothing of deceased, but which, according to the uncontradicted testimony, was not true. Furthermore, there was testimony introduced by the Commonwealth, some of which was objected to and to be hereafter noticed, to the effect that the deceased and the wife of defendant were close friends. They had associated together before defendant was married and deceased was a pupil at the school taught by the wife. The testimony shows that the two were quite playful with each other and their friendly associations continued after the marriage. There is not enough to show any improper intimacy between them but there was enough to generate in the breast of some people a jealousy and there are sufficient facts to show that defendant, at least to some extent, entertained it. It was not altogether a natural act for defendant and his brother to leave the home of their father on the evening of the shooting before eating supper on the shadowy pretense of procuring a chicken for breakfast when there were plenty of them on the premises, nor did it appear necessary for defendant to invite the deceased to go with him and his brother after the latter's suit case. At that time the trip for that purpose was expected to be a short one and there was no apparent necessity requiring four practically grown men to perform that service. We, there-

fore, conclude that the first ground urged for reversal is absolutely without merit.

2. The alleged improper evidence complained of consisted in the testimony as to the associations of deceased with defendant's wife both before and after the marriage, and a statement made by defendant to a witness that "He had the finest looking woman among any of his brothers and he was aiming to stop the boys from hanging around the school house there." The latter statement, according to the witness, was made a short while before the killing but the court subsequently withdrew it from the jury with an admonition that they should consider it for no purpose whatever. It is extremely doubtful if any of this testimony was irrelevant, because if defendant intentionally shot the deceased as described by the witnesses for the Commonwealth he was guilty of murder and any evidence tending to show motive was necessarily competent. If the associations of the deceased with defendant's wife generated jealousy in his breast causing him to make the statement testified to by the witness, but whose testimony was withdrawn, a probable motive would be shown. But, be this as it may, that statement was withdrawn and objections were sustained to much of the testimony concerning the associations and conduct between deceased and defendant's wife, and that to which objections were overruled, even if considered competent, could not possibly be prejudicial. Neither does the record disclose any misconduct of counsel in repeating questions as is so vigorously argued by defendant's counsel.

3. The court instructed the jury on murder, voluntary manslaughter under sudden heat and passion, voluntary manslaughter by gross, reckless, and careless handling and discharging of firearms when defendant had reasonable grounds to believe that it was dangerous to life, as is defined in the case of Davis v. Commonwealth, 193 Ky. 597, involuntary manslaughter, together with the usual reasonable doubt instruction as to the guilt or the degree of guilt, and the usual defining instructions. One of the criticisms under this ground is that there should have been no instruction on voluntary manslaughter under sudden heat and passion, but manifestly, from the evidence as related, this criticism is without foundation, and equally so is the one that instruction 11a which submitted the crime of voluntary manslaughter by the reckless and careless handling of firearms when there was a probable danger to life in doing so, as is pointed out in

the Davis case, *supra*. The latter criticism is directed to the alleged confused wording of the instruction but which we have examined and find no basis therefor; the truth being that all of the instructions are couched in language more clear and distinct and more easily understood than in most of the cases coming under our observation. We, therefore, find no merit in this ground.

4. The newly discovered evidence relied on relates to some statements, purported to have been made by Chester Hamblin while he was in jail under a charge for the same offense, that he had shot deceased accidentally. Two or three of the inmates of the jail made affidavits to that effect and it was claimed that two other witnesses would state substantially the same thing but their affidavits were not procured and of course their supposed evidence can not for that reason be considered. We gravely doubt, however, the relevancy of this testimony under the circumstances; but putting that question aside, and admitting its competency for the purposes of the case, the rule is that a new trial will not be granted for purely cumulative or impeaching newly discovered evidence, unless it is of such a preponderating nature as to be calculated to bring about a different result. This rule has been so often stated by this court that we deem it unnecessary to refer to the cases. Several witnesses introduced by the defendant testified to the same fact and whether the alleged newly discovered testimony was cumulative or not it was certainly impeaching and we are convinced that it was not of the character which, under the rule, would authorize the granting of a new trial. Moreover, before a new trial will be granted upon this ground it must clearly appear that the defendant exercised the requisite diligence to procure and introduce the testimony and that prerequisite does not sufficiently appear in this case. The slightest diligence would have caused inquiry to be made of the persons in jail with the witness Hamblin, and the testimony of the other witnesses cannot be considered, as we have seen, because their affidavits were not filed.

For the reasons stated the last ground considered must also be denied, leaving the trial free from any error prejudicial to the substantial rights of the defendant, and the judgment, therefore, must be and it is affirmed.