## Johnson v. Commonwealth.

(Decided Oct. 7, 1938.)

W. W. BARRETT for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

Accused was charged by indictment with the murder of one Kenton Slone, Noah Mullins being joined as an aider and abettor. Upon trial, following a motion by appellant for severance, the commonwealth elected to try him, with the result that the jury found him guilty of manslaughter, fixing his penalty at eleven years' imprisonment. Judgment was entered in accord with the jury's verdict, and he appeals.

Grounds set up in the motion for a new trial are many, but only three are urged here: (a) The verdict is not sustained by the evidence; (b) the jury's verdict is flagrantly against the evidence, and (c) the court did not give the whole law of the case, in that, as counsel says, an accomplice instruction was not given under section 241 of the Criminal Code of Practice.

The evidence tends to show that appellant and deceased were friendly, never having had any prior difficulty. The homicide occurred at the home of appellant, around nine o'clock on the evening of August 14, 1937. One witness says that about six o'clock Noah Mullins came to Eli's home, and he and his wife were sitting on the porch. He approached and one or the other asked him if he wanted a drink of liquor. The invitation was accepted, and the liquor was produced and imbibed. This witness left and later returned to Johnson's home, and the Johnsons and others were in the kitchen eating melons. In a short time Dabber Johnson came in, apparently under the influence of liquor, and asserting that he was the "worse damn man on Long Fork" or in Pike County. He was asked who was with him, and he replied that it was Kenton Slone. When the latter came in, it was learned that he had not had supper, and

he was furnished food. Afterwards an argument arose, and appellant and Dabber, who had lain on a bed in an adjoining room, came into the kitchen, and the argument continued. Appellant, or his wife, insisted that they did not want any trouble. Mullins indicated that he was going home, and started. Appellant followed him out, insisting on Mullins coming back, and he started back but Dabber had gone out and engaged in a scuffle with Mullins; appellant had started out and had gotten on the steps when Slone got off the steps and he and appellant "yoked into a wrestle," and in that wrestle Slone was shot and died soon afterwards.

Witnesses say that three shots were fired. They thought these shots were fired by appellant, who also fired some shots at Dabber Johnson. Witnesses saw no other pistol than the one used by appellant. The shots, not accurately described, took effect in the chest and in the side. After appellant came in the house he displayed a pistol and said: "Here is the thing I killed him with." He later displayed it to others, with the same or similar remarks. It is shown that prior to the homicide there was considerable drinking by the various members of the party.

Noah Mullins testified in general as to the meeting of the various parties at the home of appellant. He says he heard Dabber Johnson cursing him when he started home. He says that as he came through the front room Dabber Johnson grabbed witness and hollered "shoot," or something like that. He got loose from Dabber Johnson and asked some one to get appellant to do something with him, that he was drunk. Witness got off the porch, and Dabber again caught hold of him. Appellant came out, and Slone was behind him. Appellant motioned his hand for Slone to go back, saying, "I will get Noah to go home and there won't be any trouble." Witness then turned, and saw appellant and Slone run together, and immediately the three shots were fired. He heard no words said by either deceased or appellant.

It is gathered from the evidence, in a rather indefinite way, that some feeling manifested in an argument, existed between Slone and Mullins on account of some untoward attention on the part of Mullins to Slone's estranged wife, and it is hinted that Slone had come to appellant's home with the intention of doing harm to

Mullins. It is also argued that the shots which were fired were fired accidentally in the wrestle with deceased, to prevent him from killing Mullins, appellant or some member of his family.

Appellant, testifying for himself, says that there had been no ill feeling between himself and deceased. Dabber Johnson was a brother-in-law of deceased. On the day of the homicide appellant had been loading coal until about dark, and as to what occurred immediately before the shooting, appellant agrees substantially with the testimony related. He says his brother-in-law came "dancing" through the door, saying, "I am the worst man in Pike County." Slone followed him in, and ate some supper, which appellant's wife procured. They sat around for a while eating melons, and Dabber took a half tumbler of liquor, and later began cursing and abusing Mullins. Appellant interposed, saying, "This is the wrong time to commence threshing out things, for you know the difference between Kenton Slone and Noah Mullins, and might get a big trouble started." Things quieted down, and Dabber drank some more liquor and left the room. Appellant said, "Dabber is drunk, and going to cause trouble;" Slone saying there would be no trouble with Dabber. However, shortly thereafter an argument started again "in a pretty rough way," and appellant said, "The first man that starts trouble in here I will put him outside and keep him out." Mullins then walked out, saying, "I am going home, Dabber is going to start trouble." Appellant then suggested that Mullins remain. Dabber followed Mullins, the two clinched and wrestled, and appellant says Mullins reached a knife over to appellant's wife and said, "You already had one brother killed, I don't want to hurt him." The two wrestled off the porch into the yard, and Mullins called for appellant's wife to come and get Dabber, as he did not want to hurt him; he then got loose and started away, and as he got near the front gate Mullins called to appellant to come to him. He then says as he moved off the front step Slone ran against him, and he turned and told him to "stay in, I will go and get Dabber back, and there won't be any trouble." Appellant then took another step, and "as I did that I let my hand drop down behind him, and felt the gun, and gave it a clinch, and wrung it up to me, and it fired, and I thought I was shot in the

arm, but I never broke my hold, and hung on trying to get him loose until I wrung the gun around about here on him, and me and him tussling over the gun it fired again, and I believe that shot hit him down here, and then when it done that that weakened his hold there and then he clinched with the other hand for the gun and made back and hit at me and we tussled and scuffled, and one of us pulled off the gun another time, I don't know whether it was me or him, one of us did that.''

When the hold was broken by the fall of deceased, after the third shot, appellant had the gun and fired two shots at Dabber, as the latter ran rapidly away. He says he had seen the pistol before, but in the possession of Dabber Johnson. After the shooting appellant helped to carry deceased in the house and placed him on the bed, and later surrendered to an officer.

At one point appellant claimed that just before the first shot was fired the pistol was pointed at him, and he ''wrenched'' it, and thought the shot went into the ground, and his son corroborates this testimony. Dabber Johnson identified the pistol, and says it was his pistol, and he let Slone have it before they got to Eli's house; not for the purpose of doing harm to anyone, but he had sold it to Slone on condition that he and appellant did not make a trade of pistols between themselves.

One witness, testifying for deceased, said that just before the shooting, and before appellant threw his arm about Slone, the latter had his pistol in his hand, holding it behind him. He also says that when the first shot was fired, appellant and Slone both had hold of the gun. Appellant frankly admits that after Slone fell he shot twice at Dabber Johnson, who was doing his best, in a drunken condition, to get away from the scene.

The testimony before us, in not too satisfactory way, but possibly as could be best gotten, presents a peculiar state of facts. It is manifest that appellant was friendly with all parties. The evidence does not indicate otherwise, though it may readily be gathered that appellant was interested in not seeing Mullins molested, though he insists that his efforts were directed solely to allaying any possible difficulty in his home. A fair analysis leads us to the conclusion that there was bad feeling between Slone and Mullins, due to the circum-

stances above noted. It may be readily inferred that Dabber Johnson sided with Slone, and we can not escape the belief that Dabber, who had furnished the pistol to Slone before they reached appellant's home, in his partially drunken condition, was bent on fomenting trouble between Slone and Mullins, though we find little that Slone said or did until the wrestling between him and appellant began. It is clear that Mullins did nothing except to use his efforts to avoid any difficulty by leaving the premises, apparently over the protest of appellant.

On the facts as presented, the court gave the proper instructions on murder and voluntary manslaughter, which latter embodied the law as it applies where one commits homicide in sudden affray, or where one takes the life of another by the wanton, reckless or grossly careless handling of a deadly weapon in a way which he knows to be dangerous to human life. Lambdin v. Com., 195 Ky. 87, 241 S. W. 842. The court gave an instruction on involuntary manslaughter, based on the theory that appellant might have fired the pistol in a struggle for its possession, and had handled it, not in a wanton manner, and without intention to harm. Also one on accidental killing, and proper reasonable doubt instructions, and those defining technical words and phrases.

Counsel's main argument is to the effect that the verdict of the jury is flagrantly against the evidence, or that it is not supported by the evidence, because the appellant made a clear case of defense of himself, his home and his family. In giving his version of the homicide he does not claim in so many words that he shot in defense of himself or any member of his family, but that in struggling for the gun it was unintentionally discharged, either by himself or Slone. However, there is enough testimony by appellant, and others, to have justified the giving of the defense instruction, which, as we have observed, was correctly given under all the facts.

With this instruction given, and in view of the fact that he admitted some participation in the firing of the pistol, it becomes a question solely for the jury as to whether he had acted in self-defense, or had either murdered, or killed deceased in sudden affray, or in a wanton handling of the pistol, or in its unintentional discharge, or by pure accident.

The other argument is to the effect that the court erred in failing to tell the jury that a conviction can not be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof. Criminal Code of Practice, section 241.

Argument of counsel in this respect seems to be based on the ground that Mullins was indicted as an abettor, and that he was permitted to testify for the commonwealth. In going over the record we find that the indictment copied into the record bears the endorsement "not sufficient evidence against Noah Mullins, and the cause is dismissed as to him. J. E. Childers, Com. Atty." However, we find that when the case was called for trial appellant moved for and was granted a severance. If the indictment was dismissed, still Mullins' status depended on the proof adduced.

We have searched in vain for some evidence tending to show that Mullins was in fact an accomplice, and counsel for appellant has pointed to none in his brief. We have held many times that, if there is no evidence produced conducing to show that a witness is an accomplice, it is not proper to give an instruction on this theory. Anderson v. Com., 181 Ky. 310, 204 S. W. 71; Elmendorf v. Com., 171 Ky. 410, 188 S. W. 483. Where there is no dipute as to whether or not the witness was or was not an accomplice, the question is one of law for the court. Fox v. Com., 248 Ky. 466, 58 S. W. (2d) 608. Here there was no opportunity for dispute to arise, because of the absence of testimony which would in the least tend to show Mullins to have been an accomplice. The evidence given by Mullins was satisfactorily corroborated by some four or five other witnesses. The failure to give the instruction discussed was not error.

After a careful review of the record, we are of the opinion that there was ample evidence to justify the verdict of guilt, and we are unable to say that under all the facts the verdict was flagrantly against the evidence. Our review convinces us that the court, in every way, protected the substantial right of accused, and accorded him a fair and impartial trial.

Judgment affirmed.