## Radford v. Commonwealth.

Nov. 13, 1942.

J. M. Wolfinbarger for appellant.

78

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The grand jury of Estill county indicted appellant, Lem Radford, jointly with Tracey Covey, charging them with the murder of Otha Stevens by shooting him with a shotgun with the necessary criminal intent to constitute the crime named in the indictment. At his separate trial appellant was convicted of the crime of voluntary manslaughter and punished by confinement in the state penitentiary for twenty-one years. On this appeal therefrom his counsel urges four grounds, each of which he insists is sufficiently prejudicial to authorize a reversal of the judgment by this court. They are: (1) That the verdict was flagrantly against the evidence; (2) the admission of improper and incompetent evidence by the commonwealth; (3) failure of the court to instruct the jury on the whole law of the case, and (4) the refusal of the court to sustain appellant's motion for a directed verdict of acquittal, each of which will be disposed of in the order named.

■ Appellant at the time of the homicide was twenty years of age. His father had the contract with the United States Government to carry mail to and fro from the place of its arrival to the depot, which was being performed at that time by appellant in carrying out his father's contract. The homicide occurred at the home of Tracey Covey between the hours of seven and eight P. M. on May 4, 1942. In carrying the mail a truck was used by appellant and before he undertook the performance of that task on the day indicated, and while so engaged, his co-defendant, Tracey Covey, got with him and was riding in the truck with him. They evidently procured some drinks prior to the homicide and were—at least to some extent—intoxicated when they arrived at the depot with the mail near 6:30 of that day. At the time of their arrival there were a number of persons sitting on the steps to the depot, among whom was deceased and his brother, Emmit Stevens, the former having gone there in order to take a train, later arriving, to Winchester, Kentucky, along with another witness who intended to make the same trip.

Defendants in the indictment then left the depot riding in the truck which they later put into a garage at the

home of appellant's father to whom the truck belonged. In the meantime—and at the request of Tracey Covey— the wife of the latter was on a visit from his home and she was not present at the time of the commission of the homicide. After storing the truck defendants repaired to the residence of Tracey Covey where they remained for sometime. While there Tracey Covey procured a pistol; whilst appellant procured a shotgun, after which they walked to the depot with their weapons exposed. They plucked deceased from the crowd where the three were engaged in a more or less subdued conversation in which deceased expressed a desire for a drink. He was informed that neither defendant had any liquor along with him, but Tracey Covey then stated that he did have some liquor at his house and it was agreed that deceased would procure some soft drinks as a chaser and that the three would then go to the home of Tracey Covey and satisfy their thirst. At the time of their departure on that mission Emmit Stevens urged his brother, the deceased, to return in time to make his contemplated trip to Winchester, at which, according to the testimony of some of the commonwealth's witnesses, appellant stated that "He will not come back." The testimony goes into much detail as to what happened at the scene of the homicide after the parties arrived there, but it is indisputably shown—and admitted by appellant—that each of the three consumed more than one drink before deceased was shot. At the immediate time of the shooting the parties had located themselves in a bedroom—a part of the resident—with appellant and his co-defendant sitting in chairs and deceased sitting on the side of the bed whilst the shotgun was lying on the bed, it having theretofore been temporarily in the possession of the deceased.

The undisputed testimony shows that while the described situation existed Tracey Covey shot his pistol into a wall of the room, and about ten minutes thereafter the shotgun was discharged, the load striking deceased in the back just under his shoulder blade, from which he later died. Appellant admits that he was carrying the shotgun from the bed where it had previously been placed in order to deposit it elsewhere in the room, when it was discharged while in his hands, but just how it was caused to do so defendant stated in his testimony that he did not know, nor did he remember a number of facts about which he was inquired with reference to what occurred in the bedroom where the parties were located

just preceding, at the time of, and following, the time of the fatal shot. Tracey Covey was not introduced by either side, but some of his statements made in the presence of appellant were proven, one of which was that the defendants armed themselves as hereinbefore described before leaving the residence of appellant's co-defendant and walking to the depot, whilst another one was that appellant, after he got in company with the deceased at the depot, pointed the shotgun at the feet of deceased when his co-defendant threatened to shoot him with his pistol if he did not desist from such dangerous conduct. It was also proven that after the two defendants in the indictment returned from Tracey Covey's residence to the depot, and while the conversation between them and deceased was progressing, appellant was gritting his teeth, and then, as well as on other occasions that fatal night, stated that he "was going to kill the next son-of-a-bitch that came before him or come in contact with him." There was also proof that on other occasions during the wanderings of defendants he pointed his gun at others when it was cocked and ready to fire. It was furthermore proven by a witness that at some stage of the events preceding the homicide appellant said: "I am the worst son-of-a-bitch that ever had a mammy."

Another witness testified that he resided in an apartment adjoining the one occupied by Tracey Covey, and while sitting in his room he heard defendants and deceased engaged in a conversation, but it was so indistinct that the witness was unable to give any of it, except he heard appellant make a threat similar to the one above referred to. The witnesses for the commonwealth stated that neither deceased nor either of defendants appeared to be angry with each other in any of their contacts and conversations throughout the entire evening spent in the manner described, but no witness attempted to narrate what happened in the fatal room except appellant, who was one of the only three persons present on that occasion. There are other proven circumstances in the case showing extreme recklessness on the part of appellant in handling his shotgun with which he was armed, and that he appeared to be exercised, as well as angry, because of some undescribed difficulty between himself and a man by the name of Rucker and a son of the latter, which difficulty occurred only a short while before defendants contacted the deceased.

After the shooting, some nearby neighbors who had heard it went to the house of Tracey Covey·where the parties were, and they found, not only the doors to the building locked, but also that the screen doors were fastened from the inside. The same witnesses stated that after attempting to gain entrance into the house appellant slightly opened the door to the building and stated to the witnesses that Otho Stevens claimed to be shot but which was untrue, and that he was not hurt. Later investigations proved the falsity of that statement, and after the nature of the wounds of deceased were discovered appellant went to a nearby telephone and called for a doctor to whom he stated that it was an emergency case and that his co-defendant had been stricken with appendicitis. It was also proven that upon the visit of neighbors, following the discharge of the shotgun, appellant requested that they say nothing about what they had seen or heard, and he made a similar request of other witnesses who testified in the case. Some of the facts that we have attempted to state were denied by appellant in giving his testimony, but the facts to which the witnesses testified are abundantly shown and were no doubt accepted by the jury in rendering its verdict. The commonwealth impeached appellant's reputation for morality, and which he did not attempt to sustain.

The unnatural narrative of appellant as to how the shooting of the deceased occurred, the failure to introduce Tracey Covey in support of that narrative, the request to some of the witnesses who testified for the commonwealth to not mention anything they had seen or heard, the reckless and dangerous manner of his handling the shotgun before the parties returned to the residence of Tracey Covey, together with the proven general threats, clearly established appellant's angered condition of mind and furnished ample testimony to authorize the jury to disregard and to not accept literally the testimony of appellant as to how the shooting occurred, and to accept the theory of the commonwealth that either the shooting of the deceased was intentional, or it was the result of gross negligence and total disregard of the safety of others in the handling by appellant of his shotgun. We, therefore, conclude that the court did not err in overruling appellant's motion for a peremptory instruction of acquittal, and also conclude that ground (1) is not supported by the testimony heard at the trial.

82

■ The only evidence referred to in support of ground (2) is that concerning the difficulty between appellant and members of the Rucker family which occurred on the same day and but a short while before the homicide charged in the indictment. The details of that controversy are not shown, but the evidence did clearly prove that whatever happened, its effect was to create on the part of appellant a belligerent condition of mind which was shown by his threats to shoot "any son-of-a-bitch coming in front of him." Numerous opinions of this court sustain the materiality of such testimony as an exception to the prevailing rule forbidding proof of an independent crime. But it is permissible when the independent crime—occurring under similar conditions to those appearing in this case—shows mental attitude toward society in general, and which motivated the accused in the commission of the crime for which he was indicted. However, the testimony in this case, to which this ground is directed, did not attempt to go into details of the Rucker difficulty, and nothing appeared in the case to show who was to blame therefor. Not only so, but the small amount of testimony, given only by defendant in that regard, cleared him of any blame therefor—thus casting the entire responsibility therefor altogether upon the Ruckers. As so presented and developed, the testimony concerning that difficulty did not prove the commission by defendant of an independent crime within the rules disallowing such proof. On the contrary, it was admissible only for the purpose of showing defendant's angered and belligerent condition of mind toward mankind in general, and that the homicide was intentionally committed, or that it was done under such recklessness in handling his shotgun as to render him guilty of the offense for which he was convicted. We, therefore, conclude that the testimony referred to was admissible under the approved exception to the general rule excluding it.

■ The only argument made in support of ground (3) is that the court should not have given to the jury a voluntary manslaughter instruction, since it is insisted that there was no evidence of a struggle. However, defendant, as an eyewitness, testified to what occurred at the immediate time of the homicide. Nevertheless, it is argued by counsel that the case is one where an instruction on all phases of the crime should be submitted by

instructions. It might be true that counsel is correct if the giving of the voluntary manslaughter instruction was based altogether upon the. ground that there was no evidence of a struggle, and had no eyewitness testified in the case. But defendant, who was an eyewitness, did testify and undertook to explain how the homicide occurred, and which took the case out of the rule that all phases of the crime should be submitted where there was no evidence of a struggle, nor the testimony of an eyewitness professing to detail what occurred at the time. But counsel in presenting his argument against the giving of a voluntary manslaughter instruction ignores the fact that the testimony of defendant as an eyewitness, together with his previous conduct in handling and manipulating his shotgun, showed an intentional recklessness and disregard for human life as to authorize such an instruction under the cases of Lambdin v. Commonwealth, 195 Ky. 87, 241 S. W. 842; Smiley v. Commonwealth, 235 Ky. 735, 32 S. W. (2d) 51; Amburgey v. Commonwealth, 287 Ky. 421, 153 S. W. (2d) 918, and a number of other sustaining cases. Also the jury under the evidence adduced was not required to accept literally defendant's account of how the deceased came to his death. To begin with, his story is most highly incredible and his prior conduct on the evening of the fatal day in handling the weapon he had carried along for no purpose whatever according to his own testimony, manifested a total disregard for the safety of others, and a high degree of recklessness in doing so. Such facts under the cited cases justified the giving of the instruction complained of independently of situations where no eyewitness testified and where there was evidence of a struggle. We, therefore, conclude that counsel's objection to the giving of the voluntary manslaughter instruction is not sustainable under the testimony adduced.

Counsel also attempt to sustain this ground upon the theory that his client was entitled to. a peremptory instruction of acquittal, but which we have hereinbefore determined to the contrary. It is, therefore, apparent that counsel's argument in support of this ground is not sustained by the evidence.

■ In determining the first three grounds urged for a reversal of the judgment, we have already answered the contention made by counsel in support of this ground,

and which renders it unnecessary that it be further discussed.

In conclusion, and at the expense of some repetition, it truthfully may be said that defendant, after arriving at the depot with his shotgun, was very much irritated, which, together with his state of intoxication and the fact of his pointing his gun at others with the general threats made by him, made him and his shotgun a real danger to the safety of others, and extremely dangerous factors to anyone who might contact him, and which amply justified the instruction complained of.

Upon the whole case we are convinced that none of the grounds urged for a reversal of the judgment are well taken, and for which reason the judgment is affirmed.