## Means et al. v. Commonwealth.

(Decided March 10, 1931.)

(As Modified on Denial of Rehearing May 19, 1931.)

E. BERTRAM for appellants.

J. W. CAMMACK, Attorney General, and SAMUEL B. KIRBY, JR., Assistant Attorney General, for appellee.

Opinion of the Court by Creal, Commissioner—Reversing.

Daisy Means, Myrtle Means, and Sallie Means were jointly indicted in the Clinton circuit court for the murder of an infant bastard child of Daisy Means. On a trial the jury returned a verdict finding Sallie Means not guilty, but finding Daisy Means and Myrtle Means guilty, and fixing their punishment at confinement in the state penitentiary for life.

Sallie Means is the mother of Daisy and Myrtle Means. The Means family lived in a rural section of Clinton county, and a rumor that Daisy Means was enceinte, and had given birth to and concealed or made away with her child, seems to have gained considerable circulation in the community, resulting in a search warrant being issued authorizing the sheriff to search the Means home and premises for the child.

Sheriff W. W. Winningham, armed with a search warrant, and accompanied by Dr. J. A. Sloan and others, went to the Means home on Sunday, June 15. The sheriff and some of those accompanying him interviewed Mrs. Means and her daughters about the reports that had been circulated. Mrs. Means denied these reports, as did her daughters. The sheriff and his associates then made a search of the premises and found the body of an infant buried one hundred yards or so to the rear of the Means home. The body was wrapped in an old bed comfort, over which had been placed pieces of a baking powder box and this covered with eight or ten inches of earth. After the body was exhumed, an examination was made, and it was found that a piece of cheese cloth or quilt lining had been folded or crumpled up and placed in the mouth of the child. Dr. Sloan testified, "It was crammed in there tight." He also stated that he made an external examination of the body, and from the looks and surroundings, and the fact that the child looked to be fully developed, and had the rag stuffed in its mouth, gave as his opinion that it was born alive.

After the body was discovered, the sheriff and those who were with him confronted Mrs. Means and her daughters with the fact that the body of the child had been found. Mrs. Means still maintained that she knew nothing at all about it, but Daisy Means admitted that she had given birth to a child.

The sheriff testified that he asked Daisy who killed and buried the child, and she replied that she, Myrtle, and Velma Dixon were all present; that Myrtle and Velma buried it.

Mrs. Means and her two daughters and Velma Dixon were all arrested and placed in the Clinton county jail. No indictment was returned against Velma Dixon, but she was introduced as a witness for the commonwealth.

It appears from the evidence that Daisy Means at the time of the trial was seventeen years of age, and had made her home with her father and mother, but Myrtle Means, whose age was not disclosed, had for some time been employed in Jamestown, Tenn., where she met Velma Dixon.

On June 1st, Myrtle Means, accompanied by Velma Dixon, went to the home of her mother and there for the first time, according to the evidence of the Dixon girl, met Sallie and Daisy Means. Velma Dixon testified that she arrived with Myrtle at the Means home on Sunday, June 1st, and on the following day she and Myrtle Means accompanied Lonnie Young to Albany and had lunch at the home of his mother, after which they returned to the Means home, arriving there in the afternoon about 12:30 o'clock.

She further stated that after arriving at the Means home she and Lonnie Young drove on to the store and post office about two miles from Sallie Means' home and returned about 2 o'clock. She made inquiry about the girls, but Mrs. Means did not know where they were. She stated that in about thirty minutes Myrtle came to the house and took her down below the house in a hollow, where she found Daisy Means on a quilt and in labor; that she assisted Daisy, and when the child was delivered she tied and cut the umbilical cord and handed the child over to Myrtle; that Myrtle took the child, laid it down by her side, placed a rag in its mouth, and held her hand over its mouth; that Myrtle then wrapped the child in a piece of quilt and placed it in a gully or ditch and covered it over with some earth. She stated that the child was born alive and cried after it was born, but that after it was born she continued to assist Daisy and had nothing to do with killing the child.

On being asked what Daisy said after the child was born, she replied: "She said something ought to be done with it, that she wasn't going to take it to the house." Asked as to what Myrtle said, the witness stated: "She

begin crying after she done that—she said she would take it to Jamestown with her if she knowed she could raise it.''

She further testified that after Myrtle had placed the child in the ditch or gulley and covered it with earth, she and Myrtle attempted to carry Daisy to the house, but after a short distance found that they were unable to continue on, so Myrtle went to the house and got Carven Cross to assist them in carrying Daisy, and when they got near the corner of the garden, Rex Crawford came to their assistance; that Mrs. Sallie Means came down near where they were in the garden; that they carried Daisy to the house and put her on the bed. The Dixon girl testified that she was seventeen and that she had acted as midwife since she was about twelve years of age. This witness testified that while they were carrying Daisy to the house and after others came to assist them, Myrtle stated, ''We're all drunk as hell,'' but that none of them were drinking.

She further testified that something over a week after the child was born she accompanied Daisy and Myrtle to Melton's store, where Daisy asked for and procured a wooden box, the witness giving as her best recollection that it was a K. C. baking powder box; that she later accompanied Myrtle and Daisy to the ditch where the child was buried and saw the Means girls remove the child from where Myrtle had placed it, dig a hole with a weeding hoe and shovel, place the body in the hole, and cover it over with the box and with earth.

Robert Melton was introduced as a witness for the commonwealth, and stated that on Friday before the child was found on Sunday, Myrtle Means, Daisy Means, and the Dixon girl were in his store and asked for a box, and he told them he might have the door propped with one; that the door was propped with a K. C. baking powder box; that he paid no further attention to the girls, but later discover that the box was gone; that after the body of the child was exhumed he was over in the yard and saw pieces of the same kind of box. He did not state which girl asked him for the box.

Rex Crawford was introduced as a witness for the commonwealth, and stated that Mrs. Means and Velma Dixon asked him to help bring Daisy to the house; that he found her in the corner of the garden; that some of them made the statement, ''We're all drunk as hell,'' and he thought it was Myrtle who made this statement.

Bates Delk, jailer of Clinton county, a witness for the commonwealth, was asked this question: "Within a few days after they were placed in your custody I'll ask you if you heard Daisy Means make any statement as to the charge which was placed against them." To which he replied: "On Tuesday night I was around talking to them; we were talking about the case; I said to Daisy, 'When that kid was born why didn't you bring it on to the house?—you ought to have known it would come out on you,' and Mrs. Means says, 'Yes, sir, you ought to have brung it on, I would have took care of it the same as if it had been my child,' and Myrtle says, 'The kid was dead when it was born,' and Daisy, she says, 'Mammie you know you're the whole cause of this, you always told me if I had a kid you would run me off from home and Pa said he would kill me, and Myrtle,' and Myrtle said, 'If you had left it to me, I or we wouldn't have been here, I wanted to take the kid to Jamestown with me.' " Then he was asked: "Did either of them say whether the child was living or not?" He stated: "Myrtle said it was born dead and when she says she wanted to take it to Jamestown with her I says, 'I thought you said the child was born dead,' and then she says, 'Well, it was born alive.' "

The foregoing statements substantially, we think, cover the evidence introduced in behalf of the commonwealth.

Daisy Means, testifying for herself and the other defendants, admitted that she gave birth to a child at the time and place indicated by Velma Dixon, but that only Velma Dixon was with her; that when the child was born the Dixon girl took it and went away, and when she returned she stated that the child was dead, and that she had everything fixed all right. She then started to take the witness to the house, but they got only part of the way when the Dixon girl went on to get Myrtle to assist her, stating to Myrtle that she (Daisy) was drunk; that Carven Cross also came and helped carry her to the house. She testified positively that Myrtle was not there when the baby was born and did not put a cloth in its mouth or kill it; that she did not tell any one to kill the baby and did not see any one kill it; that the only knowledge that she had as to whether the child was born dead or alive was the statement of the Dixon girl that it was dead.

This witness also denied that she reburied or assisted in the reburying of the child, and on being asked about getting a box at Melton's store after the child was born, stated that to the best of her recollection the box was procured before the child was born.

Myrtle Means testified that she was not present when Daisy's child was born and that she had nothing whatever to do with the killing or burying of the child; that on the afternoon the child was born, she went to the home of a neighbor to get a bucket of milk and returned in the late afternoon or early evening; that when she returned Velma Dixon and Daisy were not at the house, but that the Dixon girl later came in and stated that Daisy was drunk and asked her to assist in carrying Daisy to the house; that she went with the Dixon girl and found that they could not carry her, so they secured the assistance of Carven Cross and Rex Crawford. She further stated that she had no recollection of making any statement to the jailer about Daisy's child, but she indicated that he was around trying to find out something.

Mrs. Sallie Means testified that she was not present when the baby was born, and that she did not kill the baby, nor did she see any one else kill it; that she talked to Velma Dixon about the baby after they were put in jail, and Velma stated to her that it was dead and as black as it could be and deformed all over. She was asked about the statement made by the jailer, Mr. Delk, and stated that he made no such statement in her presence or hearing.

Daisy Means was recalled by the defense and stated that she knew nothing of the statements about which Mr. Delk testified.

Lonnie Young testified that when he and Myrtle and Velma returned from Monticello, Myrtle procured a bucket and said she was going to Mr. Shipley's for some milk and that he and the Dixon girl went to the post office, and on their return they took Myrtle back home with them; that they arrived at the Means home about 5 o'clock.

Lee Cross testified that on the day the baby was born he was at the Means home; that he arrived there about 2 o'clock in the afternoon and stayed until about night. He saw Mrs. Means and Daisy and also saw Myrtle and the Dixon girl after they came from Monticello. After Myrtle and the Dixon girl arrived from Monticello, Lonnie Young and Myrtle went on down to the store or to

Mr. Shipley's to get some milk, and that Daisy and Velma Dixon disappeared and did not come back while he was there; that Myrtle returned a little before dark, and that he left about dark.

We have reviewed at unusual length the evidence, the facts and circumstances as developed in this case, for the reason that appellants' counsel is earnestly challenging the sufficiency of the evidence. It is asserted in brief of counsel for appellants that Velma Dixon was an accomplice and that her evidence was not sufficiently corroborated; that there was no competent evidence to show that the child was born alive or, if born alive, that it came to its death by unnatural means; and that the court erred in instructions given to the jury.

It is pointed out in brief by appellants' counsel that some incompetent evidence was admitted, and in this he is correct; but he very frankly admits that no objections were interposed and no exceptions save as to the admission of such evidence, and it therefore could not be taken advantage of here.

The insistence of appellants' counsel that there is no evidence to show that Daisy Mean's child was born alive, or, if born alive, that it was thereafter killed, is based on the assertion that the opinion given by Dr. Sloan was not competent and was not sufficient to establish these essential facts.

Appellants' counsel in his brief recognized the general rule that where incompetent evidence is admitted without objection, alleged error in its admission will not be considered an appeal, and inasmuch as there was no objection to Dr. Sloan's evidence, it comes within that general rule. But we might say in passing that we do not regard it as incompetent, as an experienced physician may give an opinion based on such facts as he recited.

Criticism is directed at instruction No. 2, because of the use of the words "and choked by her hands." Under the evidence in this case, we do not think this instruction erroneous in the particular indicated.

Objection is made to instruction No. 3 given by the court because of the reference therein to Sallie Means, when, as alleged, there was no evidence in any way connecting her with the crime. It is unnecessary for us to consided that matter here, as the jury in the court below found her not guilty, and she will not again be placed upon trial under this indictment.

When we come to a consideration of the question as to whether Velma Dixon was an accomplice, and whether her evidence was sufficiently corroborated, a more serious problem is presented. An "accomplice" is one of two or more concerned in or connected with the commission of a crime or misdemeanor. Spriggs v. Commonwealth, 200 Ky. 559, 255 S. W. 108. This is the rule by which the evidence must be measured to determine whether Velma Dixon was an accomplice.

She admits, although she is yet a young girl, that she has had several years' experience as a midwife. She lived at Jamestown, Tenn., and according to her own evidence had known Myrtle but a short time, and she was not acquainted with Sallie Means or Daisy Means until she accompanied Myrtle to their home the day before Daisy gave birth to the child.

The natural inference to be drawn from these facts is that she was there at this particular time to ply her trade or profession. She admits that she was present when the child was born. Daisy Means says she was present, and other evidence indicates that she was present. The body of the child was found buried near where she said it was brought into being, with every evidence indicating it had been foully dealt with.

Aside from the evidence of Velma Dixon, there is no direct evidence that any other person except Daisy Means was present when this sordid and unfortunate tragedy occurred, and Velma Dixon does not even intimate in her evidence that Daisy Means actually participated in the killing of her child. Velma Dixon, according to her own admission, was present when the child was born; she was present when it died; she was present when it was buried the first time; she was present when a box was procured, and which the evidence indicates was later used to place over the remains when the child was reburied; she was present when the body of the child was first exhumed and when it was reburied.

The test for determining whether one is an accomplice is to weigh the evidence showing his participation in or connection with the offense, and to determine from such evidence whether he could be convicted as either a principal or as an aider or abettor. Duke v. Commonwealth, 201 Ky. 365, 256 S. W. 725; Crouch v. Commonwealth, 201 Ky. 460, 257 S. W. 20.

Applying this test to the evidence might well lead to a conclusion that Velma Dixon was an accomplice.

Under section 241 of Criminal Code of Practice, "a conviction can not be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed, and the circumstances thereof."

This provision of the Code means that the corroboration must extend to every fact necessary to establish the fact that the offense charged was perpetrated by the person or persons standing accused. Miller & Smith v. Commonwealth, 78 Ky. 15, 39 Am. Rep. 194.

The general rule, in determining whether the evidence of an accomplice is sufficiently corroborated, is to eliminate from all the evidence introduced in the case, that of the accomplice, and then determine whether the remaining evidence is sufficient to connect the accused with the commission of the offense. Shields et al. v. Commonwealth, 203 Ky. 118, 261 S. W. 865; Commonwealth v. McGarvey, 158 Ky. 570, 165 S. W. 973.

So, in determining whether the evidence of Velma Dixon was sufficiently corroborated, we must eliminate her evidence from all the evidence introduced on the trial of the defendants, and then ascertain whether sufficient evidence remains, tending to connect them with the commission of the alleged offense.

Leaving out the evidence of Velma Dixon, what have we left tending to connect Myrtle Means with the taking of the baby's life? There is absolutely no other evidence that she was present, except, perhaps, the statement of Daisy Means to the sheriff immediately after the body had been found, and to the effect that Myrtle Means and Velma Dixon were present when the baby was born and when it was buried. The evidence does not show that Myrtle Means was present when this statement is alleged to have been made, and it was not competent as against her.

The jailer does testify to a statement made by Myrtle Means while she was in the jail to the effect that the child was born alive and that she would have been willing to take it to Jamestown, Tenn., if she had thought she could care for it. That was not an admission that she was present, for her statement might easily have been based on facts developed after the death of the baby. There is evidence that she was with Daisy Means and

Velma Dixon when they procured a box from a neighboring store, and boards from a box similar to the one which they procured had been used to cover the baby when it was buried the second time. This might indicate that she knew at the time that the baby was dead, but it does not necessarily show that she had part in its murder, or that she had knowledge of the fact that it had been murdered.

Then aside from the evidence of Velma Dixon, we have the alleged statement of Myrtle Means to jailer Delk, and the fact that she was present when the box was procured from the store to indicate her guilt, and the conclusion that such evidence does not sufficiently corroborate the statements of Velma Dixon is inescapable.

Again, applying the same rule and examining the corroborating evidence, after eliminating that of Velma Dixon from the case, what have we left to show the connection of Daisy Means with the crime? Not a single witness testified that she in any way actually participated in the murder of her child, nor does the statement attributed to Daisy by Velma Dixon to the effect that "something ought to be done with it, that she wasn't going to take it to the house," tend to indicate that she aided, abetted, advised, or consented to the murder of her child. Nor is it reasonable that under the circumstances she could have had an actual part in its murder. This girl, only seventeen years of age, had passed through hours of agonizing travail, and all the physical pain, suffering and mental anguish attendant upon childbearing, leaving her sapped of vitality and in such a complete state of exhaustion that it required the combined efforts of four persons to carry her to her home. It is improbable that after going through this ordeal she was possessed of sufficient vitality to have had part in the murder or the burial of her baby.

In the Attorney General's brief it is pointed out that only the Means girls had a motive for this crime, and that their motive was to hide the shame and disgrace that must come to Daisy Means and her family as a result of her waywardness and indiscretion. While it is always competent to show motive, that alone is not sufficient to warrant a conviction. The evidence of the motive, coupled with the other evidence tending to connect Daisy Means with the commission of the crime charged in this case, is not sufficient to warrant her conviction.

376

There is little escape from the conclusion that this child was murdered, and the natural impulse of the normal mind would dictate that the participant or participants in that crime be punished; but when we take from the case the evidence of Velma Dixon, we enter into a field of pure speculation in trying to determine and fix the guilt. Courts are not and should not be required to resort to guess, surmise, or suspicion when passing upon the rights and liberties of those standing accused of crime.

The verdict of the jury as to Myrtle Means is not sufficiently supported by evidence if Velma Dixon was an accomplice, but otherwise the evidence is sufficient to warrant the submission of the case to the jury as to her. When, as in this case, there is a conflict in the evidence as to whether a witness is an accomplice, the trial court should not as a matter of law determine that question, but should under proper instructions submit it to the jury for determination.

Wholly apart from any question of Velma Dixon's complicity in the alleged crime, there is not sufficient evidence to warrant a conviction of Daisy Means, and the trial court should have instructed the jury to find her not guilty.

For the reasons indicated the judgment is reversed, and the cause remanded to the lower court for a new trial and for further proceedings consistent with this opinion.