## Goodin v. Commonwealth.

(Decided Oct. 26, 1934.)

2

WAUGH & HOWERTON for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

John G. Goodin has appealed from a judgment imposing upon him two years imprisonment for arson.

Goodin owned three five-room cottages on Twenty-ninth street in Ashland, Ky., being numbers 1069, 1073, 1077. These houses were all drenched with kerosene and set on fire by Norma Davis and her husband, Jesse Davis, in the early morning of October 20, 1932. Whether Mr. and Mrs. Davis did this because of some grudge against Goodin or because he had hired them to do so, is sharply disputed. Some one discovered the fire and the alarm was turned in at 4:35 a. m. The fire department responded so promptly and worked so effectively that the fires were extinguished before any great damage had been done to the property.

On March 9, 1933, the grand jury returned an indictment charging John G. Goodin, Mary Myers, Jesse Davis, and Norma Davis with having burned this property pursuant to a conspiracy formed for that purpose.

Mary Myers is a well-to-do woman 52 years of age, her husband is 72 and in poor health. Her son, W. L. Myers, is 27 years of age.

John G. Goodin is a well-to-do man and a passenger conductor on the C. & O. Ry. He and his wife then lived in Louisville but he had a room at the Myers' home and boarded there when in Ashland; his duties on the railway compelling him to spend a part of his time in Louisville and a part of it in Ashland.

Mrs. Myers, her son, W. L. Myers, and the defendant, Goodin, were associated in the conduct of a dry-cleaning establishment known as the Swiss Dry Cleaners, which business was under the active management of W. L. Myers.

Jesse Davis is not much of a social figure, he makes no claim to having any settled occupation, and from this.

record we gather he is of the submerged type, and that in the Davis home, his wife is not only the provider but is also director of operations or as he expressed it, "She rules the roost." The evidence shows her reputation is bad; that she will lie and steal; that she is a bootlegger; and that she admits firing these houses, but she is a good worker and she was formerly employed at this Swiss dry-cleaning establishment, and had from time to time worked in this Myers' home as a domestic, but not at any time recently.

Her employment during the spring and summer before this fire was at this dry-cleaning establishment where she did repair work and soliciting.

In August, 1932, Mr. W. L. Myers discharged her, which he testifies made her mad and Mrs. Myers testifies Mrs. Davis asked her to get her son to take her back and she refused to do so. Mrs. Myers testified, "She must have been awful mad at me from the dirty things she has been saying about me all over town. Of course, she is mad at everybody, I guess, and wanted to do me dirty." Miss Mary Francis Myers testified Mrs. Davis became very angry at her mother because of this.

While Mrs. Davis was so employed, she and her husband lived in house 1073, which according to Goodin was rented to her furnished, not only with furniture, but that he paid the water, gas, and electric light bills, for which Mrs. Myers, and Goodin testify he was paid $30 per month rent by her and that she paid her rent up to August 1, 1932, during which month the Swiss Dry Cleaners discharged her and Goodin says he began to ease her out of the property and Goodin's theory of this fire is that Mrs. Davis set fire to this property to get even with him for refusing to let her have $45 which she desired to use to make a first payment on an automobile, to get revenge for being discharged by the dry-cleaning plant, and to conceal the loss of certain furniture which she had moved out of this house 1073 when Goodin eased her out of it, whereas she testifies she did get from Goodin the money to make her payment on this automobile, occupied this house rent free, that Mrs. Myers gave her the furniture which she took out of this house before the fire, and that the only return expected of her for the occupation of these houses was that she would for Goodin collect the rent on the other two, and that she moved out because she did not want to be there

when it was burned, which she had agreed with Mrs. Myers she would do, to enable Goodin to collect the insurance on the property, for which Mrs. Myers told her Goodin would pay her $750 when he collected his insurance.

These houses cost $10,800 to erect, $8,400 was loaned on them by the Home & Savings Building Association of Ashland, and insurance policies for that amount were then procured upon the property and deposited with it as collateral security for its loan. Goodin acquired these cottages from Dr. J. D. Williams in exchange for a piece of business property and Goodin took over the insurance that was on them and has since kept it up, $2,800 on each cottage, but has by payments to the Home & Savings Building Association reduced the debt to it to about $2,500 per house.

Mr. Geo. W. Snodgrass, an insurance agent, testified he acquired an insurance business that had formerly belonged to a Mr. Roper and that he found a copy of a policy of $2,000 written by that agency upon furniture in cottage 1073, and that he canceled that policy after the fire, but he was unable to say the policy had ever been delivered to Goodin, and that is all that was ever shown regarding insurance on this furniture. When it was written, the items it covered, when it would expire, and what was done with it nowhere appears.

If we could receive unconditionally the testimony of Mr. and Mrs. Davis, then it is shown Goodin was their confederate, their employer, their accomplice in this crime, but they are self-confessed arsonists, so engaging for hire, and the court correctly told the jury that Goodin could not be convicted upon their evidence unless it be corroborated by other evidence tending to connect Goodin with the crime, and that it is not enough if it merely show the crime was committed and the circumstances of its commission, so our problem is to look in this record for the evidence coming from sources other than Mr. and Mrs. Davis, connecting Goodin with the burning.

We shall now examine this evidence item by item in search for such corroboration if any there may be.

### Refusal to Swear Out a Warrant.

The authorities began an active investigation of this fire. Goodin told them certain furniture was miss-

ing and soon they found in the possession of Mrs. Davis certain goods alleged to have come out of this house 1073 and they carried Goodin out to see it. They say Goodin said it looked like his furniture, but it had been done over (painted) and he was afraid to identify it and would not swear out a warrant charging the Davises with taking it.

### The Employment of Levi.

Mr. C. R. Levi, an attorney in Ashland, testified that after Mr. and Mrs. Davis had been arrested and put in jail, Mr. Goodin employed him. Goodin was not then charged with anything, and that Goodin came to discuss with him the matter of their arrest. That was all to which Levi was permitted to testify in the presence of the jury.

Goodin testified about this incident and he testified he employed Levi to attend the examining trial of Mrs. Davis, not as her representative but as his, to see what they had against her, that he did not employ Levi to defend the Davises, but as he was working and could not be there, he wanted Levi to find out what they had against the Davises.

### The Stenographer's Notes.

Some one connected with the state fire marshal's office had interrogated various parties, including the Davises relative to this fire, and the questions and answers were taken down by a stenographer and transcribed by her, and Goodin got from her a transcript of those questions and answers.

The commonwealth urges the refusal of Goodin to swear out warrants against the Davises for taking his furniture, his employment of Levi to attend the examining trial, and his procurement of a copy of the notes taken when the fire marshal made his investigation as circumstances to connect Goodin with this crime. Of course, one can be connected with a crime by circumstantial evidence and an accomplice can be corroborated by such evidence, but we have often said of circumstantial evidence that if it is as consistent with the innocence of the accused as with his guilt, it is insufficient. See Tarkaney v. Com., 240 Ky. 790, 43 S. W. (2d) 34, and we have held that rule applied to the corroboration of accomplices. See Bowling v. Com., 193 Ky. 642, 237

S. W. 381, and Mattingly v. Com., 195 Ky. 838, 243 S. W. 1044, and C. J., p. 705, sec. 1439.

We know from malicious prosecution suits reaching this court that the arrest of a person, if he be not convicted, frequently results disastrously for the person who has it done and that a man who acts on the advice of counsel, after such counsel knows all the facts, is safe, hence Goodin's claim that he was afraid to identify the furniture, his employment of Levi to find out what they had against the Davises, and his procurement of a copy of the fire marshal's investigation are all perfectly consistent with the conduct of an innocent man, and the value of these three alleged items of corroboration is zero.

## Motive.

For the commonwealth it is argued Goodin had a motive for this arson and that is urged as corroboration of the Davises. That raises two questions. Had Goodin a motive? Can motive corroborate an accomplice?

Burning houses that cost $10,800 to build in an effort to get $8,400 of insurance is not much of a motive, especially when $7,500 must be immediately taken to pay liens upon the houses. But it is urged the personal property was overinsured and Goodin hoped to get $2,000 by its destruction, but the commonwealth failed to show Goodin had any insurance on this personal property.

Moreover, accomplices cannot be corroborated by showing motive alone. See 16 C. J., p. 707, sec. 1443; Means v. Com., 238 Ky. 366, 38 S. W. (2d) 193.

In People v. Becker, 210 N. Y. 274, 104 N. E. 396, in reversing a conviction of Becker for the murder of Rosenthal, this question is discussed and it was so held in both of the concurring opinions. It was so held in Vails v. State, 59 Tex. Cr. R. 340, 128 S. W. 1117, 1120, and in Williams v. State, 152 Ga. 498, 110 S. E. 286, the Supreme Court of Georgia, after citation and elaborate discussion of these and other cases, reached the same conclusion.

In the Vails Case the court said:

"The fact that a man may have ill will towards another or wish him harm and express his dislike in

vigorous language ought not to put him at the mercy of a confessed criminal.''

The courts seem not to exclude evidence of motive entirely, but to regard motive alone as not sufficient to corroborate. an accomplice. For example, Mr. Good Citizen may dislike a man in his community, he may regard him as a Shylock who collects usurious interests, who oppresses the poor, and by improper means enriches himself at their expense, and both in season and out of season Mr. Good Citizen expresses his contempt for this usurer and evidences his loathing of him, yet Mr. Good Citizen would never dream of doing violence to this usurer; but if some racketeer should slay this usurer, should when apprehended admit his guilt, and say Mr. Good Citizen had paid him $500 to slay the usurer, and motive alone would corroborate the evidence of this racketeer, Mr. Good Citizen would be in a bad fix. So this item of corroboration amounts at the most to a qualified zero.

### Mrs. Hanley Moving Out.

Mrs. Hanley was a tenant of Goodin's cottage 1069, and had been such for over a year. She moved out two or three weeks before the fire at Goodin's request so she testifies and that he told her he wanted to rent this house furnished. Mrs. Davis testifies Goodin had Mrs. Hanley move out in order that the Davises might get this house ready for the fire. Mrs. Hanley on cross-examination, however, testifies she was one and one-half months behind in her rent, but sought to excuse that dereliction first because the sink was stopped and Goodin would not have it fixed and the further reason that Goodin had not called to collect the rent, for which she says Mrs. Myers had asked her once and Mrs. Davis had asked her once.

Her son testifies they sent Goodin word about the sink, and that Goodin wrote him a letter the sink was all right, and on cross-examination he admitted Goodin had the sink fixed once, and that he told Goodin he was going to move out and Goodin then said he would like to have his house by October 1st.

This evidence about allowing or having Mrs. Hanley to move out when she was one and a half months behind with her rent is entirely consistent with the conduct of an innocent man, and applying what we have

said above about circumstantial evidence, it amounts to nothing.

Of course, the statement of Mrs. Hanley that Mrs. Davis asked her for the rent corroborates the testimony of Mrs. Davis that she was to collect the rent on houses 1069 and 1077 for her occupancy of 1073, but this is a collateral matter only and the corroboration required must be as to some matter of material importance upon the question of the guilt or innocence of Goodin and tending to connect him with the crime. See Bowling v. Com., 79 Ky. 604, and 16 C. J., p. 704, sec. 1437. So this evidence amounts to nothing.

### The Mortgage.

Mrs. Davis produced a paper which appears to have been a mortgage to the Swiss Dry Cleaners for $145 signed by Mrs. Davis and witnessed by Goodin. (This paper was taken from the courtroom by the commonwealth's attorney and lost or misplaced and it is not before us.) It is urged that this paper corroborates Mrs. Davis' testimony that Mr. Goodin let her have $45 to make the first payment on an automobile to use in hauling kerosene to use in burning these houses. If Goodin was going to let her have $45, what was the need of this mortgage?

We know she never got any money on this mortgage for she says she did not owe the Swiss Dry Cleaners anything and so does W. L. Myers, its manager; besides it shows up in her possession, so this evidence is clearly a zero.

### The $1 for Plaster.

Goodin testifies that after he had moved out of house 1073 he gave Mr. Davis the keys to these houses, three padlocks, and $1 to get some plaster and repair some broken places in the plastering around the plumbing work around the sinks, and that was the only time he ever spoke to Mr. Davis in his life. Davis said the plastering he did was in cottage 1073.

It is agreed by every one that Davis, at the direction of Goodin, put one of these padlocks on the back door of each one of these cottages. Goodin said he wanted this done to keep any one from getting in the houses, that he had them put on the back doors because

he did not think any one would try to come up to the front of the houses to get in.

Mr. and Mrs. Davis say the object of having these repairs made was to prevent any suspicion that might be aroused by their being in and about the property while they were arranging to burn it. This repairing was done, so Mrs. Davis says, on Monday October 17th, and she said originally that she swept out the houses and returned the keys that day. The fire occurred Thursday morning.

The Davises testify they were told by Mrs. Myers to take off some of the plaster and to put papers in and around the house, to use kerosene, etc. Of course, Mrs. Myers denies this.

If the plastering was to be taken off as Mrs. Davis says Mrs. Myers told her, we wonder why it was to be repaired. Could not the houses be burned without making these repairs?

These are not matters that connect Goodin with the fire but are circumstances from which one might draw inferences connecting him with the fire, but again we run counter to the rule that circumstances as consistent with innocence as with guilt are not enough so this is another zero.

### Goodin's Suspicious Remarks.

Mr. Goodin did not go in these houses when he visited them the morning after the fire, and, when asked why he did not, he said he was afraid, and, when asked what he was afraid of, he said: ''I might have took hold of something and had finger prints on it and it showed up that I had been there.''

This remark sounds like a suspicious circumstance, but in view of the rule that circumstances as consistent with innocence as with guilt will not support a conviction, this amounts to nothing. The crime was then fresh. That it was a case of arson was evident, an investigation by the Ashland authorities was in progress, one by the state fire marshal was in expectancy, and Goodin may have contemplated making an investigation himself. An innocent man would want all evidence left undisturbed, whereas a guilty man would have rushed in while he had witnesses present and fingered everything so that if his finger prints were afterwards discovered

he could say, "Those I made the morning after the fire in the presence of all these witnesses." This certainly amounts to zero.

## The Keys.

All these houses were locked all around when the fire department got there. The evidence of Mr. and Mrs. Davis is a little hazy about the details of the fire, but we presume they locked the houses after starting the fire. Mr. Davis, when asked how he got into these houses, said he had the keys to all three of them, that Goodin had given them to him, and after firing the houses he gave the keys to Mrs. Davis. Mrs. Davis testifies she returned the keys to Mr. Goodin the morning after the fire. That they were covered with coal oil and Goodin washed the oil off of them or said he would do so.

Miss Mary Francis Myers, a daughter of Mrs. Mary Myers, was introduced by the commonwealth and she testified that Mr. Davis, after making these repairs and some days before the fire, came to the door and rang the bell and she and her mother were there and he handed them the keys. She testified Mrs. Davis called at the Myers home the day of the fire, but that she did not bring any keys to any one, nor were any keys brought there by any one after the fire.

Mrs. Myers testified no keys were brought there that morning by any one, but she saw the keys in the place they were usually kept early that morning when she was told of the fire.

Goodin testified he did not know when these keys were returned, but he saw them there in his room early that morning just after he was notified of the fire.

The commonwealth weakened the effect of this evidence very much by showing by Goodin, on cross-examination, that these cottages had common locks on the front doors and that one or two he knew could be unlocked with ordinary skeleton keys and perhaps all of them. Mrs. Myers, her daughter, and Mr. Goodin all admit Mrs. Davis was at the Myers home near noon on the morning of the fire, her evidence, so far as this visit is concerned, is corroborated, but a visit by her to this home does not tend to connect Goodin with this fire, for all the evidence shows Mrs. Davis felt very free about

coming to and entering this home. Miss Mary Francis Myers testfiied that she had asked Mrs. Davis to leave and her mother had asked her to leave, and of this Mrs. Myers testified, "She was like a dog. You would kick her out the front door and she would come in the back. She has been told to stay away a number of times, but she has worked for us so long—a number of years—as our hired girl, and that's why she felt that she had the right to come right back."

If the commonwealth had some evidence other than the testimony of Mrs. Davis that she left the keys to these houses there at the time of this visit, then it would have something from which an inference could be drawn connecting Goodin with this fire. The importance of this was not overlooked by the commonwealth and it called Miss Mary Francis Myers as a witness and showed by her Mrs. Davis made a visit to this home on the morning of October 20th, but when they asked Miss Myers about the keys, she said Mrs. Davis left no keys there that morning, but that they were left there by Mr. Davis some days before.

We have reviewed every item of evidence from sources other than the Davises, in search of something that might corroborate them and connect Goodin with this crime, and each item examined amounted to zero and the sum of any number of zeros is still zero as we said in Dossenbach v. Reidhar's Ex'x, 245 Ky. 449, 53 S. W. (2d) 731.

There was evidence offered by the commonwealth concerning the purposes for which Goodin employed Levi, to the introduction of which Goodin objected, and it was properly not admitted, upon which we are urged in brief for the commonwealth to affirm this judgment, but we must rest our judgment upon what the jury heard.

Mr. and Mrs. Davis corroborated each other, but such corroboration is not to be considered. See Howard v. Com., 110 Ky. 356, 61 S. W. 756; Fryman v. Com., 225 Ky. 808, 10 S. W. (2d) 302; Lane v. Com., 134 Ky. 519, 121 S. W. 486; Porter v. Com., 61 S. W. 16, 22 Ky. Law Rep. 1657; 16 C. J., p. 710, sec. 1453.

Mr. and Mrs. Davis are corroborated as to their purchase of the kerosene and as to parking their automobile on Forrest avenue near these houses just a few

hours before this fire, but that sort of corroboration helps us none for it in no way connects Goodin with this crime. See 16 C. J., p. 703, sec. 1436.

The corroboration of the Davises, which the commonwealth needs in order to fasten this crime upon him, must touch him somewhere. He cannot be tied to this crime without something to tie with. The commonwealth, after eliminating the testimony of the Davises, must have at least something left connecting him with this fire and it has not anything.

Whether the commonwealth must have evidence to corroborate every fact necessary to show Goodin was guilty as held in Smith v. Com., 242 Ky. 399, 46 S. W. (2d) 513, headnote 4; Means v. Com., 238 Ky. 366, 38 S. W. (2d) 193, headnote 6; Privett v. Com., 233 Ky. 471, 26 S. W. (2d) 3, headnote 3; and Miller v. Com., 78 Ky. 15, 39 Am. Rep. 194, or its evidence need only be sufficient to corroborate the testimony of the Davises upon some fact that tends to connect Goodin with the crime as stated in Mitchell v. Com., 240 Ky. 258, 42 S. W. (2d) 305; Fox v. Com., 248 Ky. 466, 58 S. W. (2d) 608; and Elmendorf v. Com., 171 Ky. 410, 188 S. W. 483, we need not decide, as there is not enough here to meet either requirement; hence it follows this judgment must be reversed.