## Walker v. Commonwealth.

(Decided Jan. 22, 1935.)

H. F. PRICE for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS and H. HAMILTON RICE, Assistant Attorneys General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Affirming.

Deck Walker has been convicted of the murder of Walter Wilcox, sentenced to life imprisonment, and is appealing. The indictment jointly against him, Estill Riffe, and Homer (Red) Combs, in addition to the usual charge of murder, in a second count charged that the crime was committed pursuant to a conspiracy entered into between defendants and other persons.

The first ground argued for reversal is that the only evidence connecting appellant with the commission of the alleged crime was that of defendant Combs, who, it is shown, was an accomplice, and that, because his evidence was not sufficiently corroborated by other witnesses, there was not sufficient evidence to warrant a submission of the case to a jury or to sustain its verdict.

It is established by evidence that Charlie Neal, a deputy constable, and other state and federal officers, had been active in locating and raiding illicit stills in Boyd county. Combs testified that he, appellant, and Estill Riffe were partners in a moonshine still on Campbell branch in Boyd county near the home of George Barker. Campbell branch is a small stream about 3½ miles from Catlettsburg, and, as we understand the record, was, at the time of the homicide, spanned by a covered bridge constituting a part of the Big Sandy highway. Immediately north of this branch was a narrow road leading from the main highway up Campbell branch to and beyond the home of George Barker. The homicide occurred about 7 or 7:30 on the evening of March 18, 1926. Combs testified: That about 3 o'clock in the afternoon he was in the vicinity of the office of the United States commissioner near the courthouse in Catlettsburg watching to learn which way the officers would go. That Charlie Neal came down the stairs from the commissioner's office, told him there was going to be a raid on Campbell branch, asked him where Deck

Walker was, and told him to tell Deck. That he got in an automobile, found appellant and brought him back to the place, and that appellant and Neal were in a conversation for several minutes. That, in about an hour and a half or two hours after this conversation, he, appellant, and Riffe got in a Ford coupe and went to Mr. Barker's home on Campbell branch and while there went to the still, turned over the mash, and got rid of the outfit. After leaving Barker's, they returned to the highway near the covered bridge, where they engaged in drinking, and, while there, a man and woman passed in a Ford coupe going toward Catlettsburg. After some time they returned to Catlettsburg, and, as the witness expressed it, "fooled around for a while and went down to Lizzie Rice's," and later all three drove back to the covered bridge. He and Riffe each had a .38 pistol and appellant had a .32 or .38 automatic. That Charles Neal had given Deck Walker signals that were to be used when they got near the bridge and, when they arrived at that point, appellant stopped the automobile, said, "Wait a minute," flashed the headlights on the automobile on and off, sounded the horn twice, and they all got out of the car and went through the bridge. When they got through the bridge, a man came out of the brush. That he tried to get to the man before appellant did, but that the latter beat him and shot the man. That Walker fired three or four shots, and that Riffe shot once in the covered bridge as they were going back to the automobile. Homer Brown, who lived near the home of Gavith Wilcox, father of deceased, testified that he went to Catlettsburg in the afternoon about 1 o'clock, told Charlie Neal about the still, and made arrangements with him to come out there that evening between 7 and 8 o'clock; that they arranged for the officers upon their arrival to sound the automobile horn two or three times and flash the lights off and on; that, after he returned home, he, Walter Wilcox, and Gavith Wilcox went over on the hill close to where the still was located. He informed them of the arrangements with Neal as to the signals to be given and for Walter to go down to the bridge to meet the officers. A short time after Walter left, he heard three or four shots in rapid succession, a pause, and then a big gun fire. Howard Cannon, a constable of Boyd county, testified that he, Charlie Neal, and other state and federal officers were active in raiding moonshine stills about the time of the

homicide; that in the afternoon and before the shooting he saw Charlie Neal and appellant in a conversation in front of Dick Mitchell's garage opposite the office of the United States commissioner. When pressed as to how he remembered the time he saw Neal and appellant in conversation, he testified that he had talked with Neal about making the raid. Charlie Bryant and Miss Fay Lockwood testified that they passed the covered bridge between 5 and 6 o'clock going toward Catlettsburg in a Ford coupe and saw three men standing near an automobile, one of whom was drinking out of a gallon jug. Bryant testified that it was appellant, Combs, and Riffe. Mrs. Boyd Jarrell, who lived on the Big Sandy highway near the covered bridge, testified that deceased came to her house about 7:30; that, hearing a noise, she went out and found him lying at the back door in such condition that he could not talk; that she ascertained that he had been shot and made arrangements for him to be taken to the hospital. Gavith Wilcox testified that in the afternoon before the killing he was on the hill near the still hiding above the Barker home; that he saw a man with something like a ''thumping keg'' come down out of a hollow to a point about 80 feet from where he was and hide it in the leaves near a tree. Replying to a question as to who the man was, he stated, ''I don't know who it was but Deck Walker looks like the man to me.'' He further testified about going with his son and Homer Brown out near the still site in the evening and hearing three shots in succession and then a pause followed by a shot from a larger gun; that the sound of the shots appeared to come from the direction of the bridge where his son had gone. He saw nothing more of his son until the following day, when he went to the hospital in Ashland. Lizzie Rice testified that about the time of the killing Estill Riffe spent a part of his time at her home; that on the night of the killing he got out of a Ford coupe, and she could tell that Deck Walker and Red Combs were with him; that about a half hour later Walker and Combs came back in the same automobile and got him. Sophia Wellman testified that she was at the home of Mrs. Rice on the evening of the shooting and that Estill Riffe came there in a Ford coupe and Deck Walker and Red Combs were with him. L. A. Music, a minister of the gospel, testified that twice on the day following the shooting he went to see Walter Wilcox in the hospital in Ashland and talked

with him; that in the morning Walter told him he was suffering death and, with respect to the shooting said:

> "The car came from the direction of Catlettsburg and stopped near the end of the bridge, blinked the lights and honked the horn as he was expecting the officers to do. He came out of hiding and three men got out of the car and the man nearest him said, 'That you Walter?' When he responded in the affirmative the man said, 'You are the one we are looking for,' and proceeded to shoot him."

The witness returned to the hospital in the afternoon and saw that deceased was sinking very rapidly and, when he tried to console him, the latter said, "I can't be here long, within my body there seems to be a fire burning," and later said, "What I told you this morning was true." R. N. May, another minister, testified that he was with Walter Wilcox in the hospital and the latter said, "I don't think I am going to get get well," and, in detailing what occurred at the time of the shooting, stated, in substance, that the car came out and gave the signals; he then made himself known to the occupants of the car; that they got out and came to him and when a short distance from him opened fire on him.

According to the evidence of physicians and others, deceased suffered three gunshot wounds, one in the finger, one through the right arm and one in the abdomen, passing through the liver. He lived about 24 hours after being shot.

From the foregoing it will be seen that the evidence of the witness Combs is corroborated by direct evidence in practically every material detail, except as to the presence of appellant at the scene of the crime and his actual participation therein and as to the joint ownership and operation of the still by the three defendants in the indictment, and in the latter details he is corroborated by strong circumstantial evidence. Counsel for appellant in argument that the evidence of the accomplice is not sufficiently corroborated relied on Means v. Commonwealth, 238 Ky. 366, 38 S. W. (2d) 193, Runyon v. Commonwealth, 218 Ky. 583, 291 S. W. 742 and a number of cases holding in effect that, in measuring the sufficiency of the corroborating evidence, the evidence of the accomplice should be eliminated and it should then be determined whether the remaining evi-

dence is sufficient to connect the accused with the crime, and that the corroborating evidence is not sufficient unless it extends to every fact necessary to establish the fact that the offense charged was committed by the accused. In the case of Williams v. Commonwealth, 257 Ky. 175, 77 S. W. (2d) 709, decided November 9, 1934, there is an exhaustive history of the rule respecting the evidence of an accomplice and the purpose for which sections 241 and 242 of the Criminal Code of Practice respecting such evidence was enacted. It is pointed out in that opinion how this court has gradually extended and enlarged upon the rule enunciated in section 241 of the Criminal Code of Practice until it has virtually been held that, wholly apart from the evidence of the accomplice, the evidence should be sufficient to warrant a conviction of the accused; and it was held in effect that to meet the requirements of the Code provisions it was only necessary, as indicated by its express and plain provisions, that the corroborating evidence should tend to connect accused with the commission of the crime. It is manifest that the corroborating evidence in this case meets the Code requirements as interpreted in this recent case, if, in fact, it does not fully meet the requirements of the rule laid down in all of the cases relied on by appellant. In this connection it may be said with respect to the contention of counsel for appellant that the court erred in admitting statements of other parties out of the presence and hearing of appellant and in giving an instruction on the law of conspiracy that the evidence strongly tends to show a conspiracy between the defendants in the indictment and other persons, and, in such circumstances, the evidence complained of was competent and admissible. This being true, it follows that the court did not err in giving the conspiracy instruction.

It is contended by counsel for appellant that the evidence of L. A. Music and R. N. May as to statements made by deceased on the day of his death, and admitted as dying declarations, was incompetent because, as a necessary condition precedent to the admission of this evidence, it was not shown that deceased was, at the time, under a sense of impending death. To one of these witnesses deceased expressed the belief that he would not get well; to the other he stated more than once that he would not be here long. He was mortally wounded, racked with pain, and sinking very rapidly

when his last statement was made to Mr. Music. Death followed within a few hours.

In the case of Whitehead v. Commonwealth, 200 Ky. 440, 255 S. W. 93, 94, it was held that the statement of the declarant offered to be admitted as a dying declaration may be interpreted in the light of the facts and circumstances surrounding him at the time, and his belief that death is impending may be gathered from what he says considered in connection with the seriousness of his wound and the fact that he died in a comparatively short time thereafter. In that case deceased had twice reiterated that "He would never get well, and believed he would have to die." The court held that this, considered in connection with other facts and circumstances as above indicated, rendered his statement competent and admissible as a dying declaration. A number of cases are cited in the opinion as supporting this holding. In the light of the cases and authorities therein cited, it is obvious that the court did not err in the admission of this evidence.

The witness Combs admitted that, after he was arrested and placed in jail, he made a statement to one or two parties at the jail concerning the homicide; that he was thereafter taken to the office of the commonwealth's attorney who was conducting the prosecution and made a further statement. His impression was that his statement was reduced to writing, but he did not remember whether he signed or swore to it. He denied, however, that he made a statement that he fired the fatal shots. The persons before whom he made a statement at the jail were called as witnesses for defendant and testified that he made a partial statement and later a more comprehensive one in the office of the commonwealth's attorney. One of them testified that he stated that he shot Walter Wilcox. The commonwealth's attorney was introduced by defendant as a witness and testified that Combs after his arrest made a statement at his office which was reduced to writing, but his recollection was indistinct as to whether the statement was signed or sworn to; that the statement was somewhere among his private papers. He was asked to produce the paper, and, upon refusing to do so, counsel for appellant moved the court to order a subpoena duces tecum issued, directing the witness to produce the written statement about which he had testified, but the court over-

ruled the motion, and it is now insisted that this was prejudicial and reversible error. There is some discussion in brief as to whether this was a privileged communication concerning which the commonwealth's attorney would not be required to testify, and counsel for appellant cite a number of cases from foreign jurisdictions and also text authorities holding that such a statement is not privileged, however, there is no avowal as to the contents of the statement and no evidence to indicate that it was material to appellant's defense. In such circumstances we are constrained to hold that the cour did not err in overruling the motion.

At the close of the evidence for the commonwealth, the defendant moved the court to set aside the swearing of the jury and to continue the case until the next regular term of court on the ground that he was taken by surprise on account of the evidence of certain witnesses introduced by the commonwealth and filed his own affidavit in support of the motion. The affidavit is to the effect that on a former trial the witness Combs testified that, at the time he made his first statement to officers connecting defendant with the murder of Wilcox, he was under the influence of ''dope'' and had been given to the use of narcotics for eight years prior to the time, and that upon the present trial he testified that at the time he made the statement he was not under the influence of ''dope'' and was not a drug addict, but was under the influence of an intoxicant; further, that he was taken by surprise by the evidence of Messrs. Music and May concerning statements of deceased at the hospital and by statements of other witnesses introduced, by the commonwealth; that, if given time, he would procure witnesses to rebut such evidence.

The official court reporter who took the stenographic notes of the evidence on a former trial was called as a witness and testified that Combs did make the statements on the former trial in substance as set forth in the affidavit. It is apparent that there could have been no more effective way of showing that there had been a change in the evidence of any of the other witnesses or that they had testified on a former trial.

In the case of Patterson v. Commonwealth, 252 Ky. 285, 66 S. W. (2d) 513, and cases therein cited, it was held that the commonwealth is ordinarily under no duty to furnish to the accused information as to what

proof will be introduced on the trial other than such as may be conveyed through the charge in the indictment. In the latter case, reference is made to the case of Eaton v. Commonwealth, 230 Ky. 250, 19 S. W. (2d) 218, wherein it was held that the court did not err in overruling defendant's motion for a continuance on the ground that he was surprised by evidence referred to by the commonwealth's attorney in his opening statement to the jury where there was no affidavit showing the nature of the alleged surprise and how and by what witnesses the new evidence of which he had been apprised by the statement would be rebutted. While there was an affidavit in this instance, it did not meet the necessary requirements as indicated in that case. It is therefore apparent that the court properly overruled appellant's motion.

Finally it is urged that the court erred in refusing to grant a new trial on the ground of newly discovered evidence. In support of his motion, appellant filed his own and the affidavits of the alleged newly discovered witnesses. Without going into detail as to the other affidavits, it may be said that the evidence referred therein would only be admissible as tending to contradict or impeach the evidence of the witnesses Combs and Music. It is a rule of general application in this jurisdiction that a new trial will not be granted on the ground of newly discovered evidence which merely tends to impeach or discredit a witness or witnesses unless the evidence is of such a convincing character that it might have a decisive effect on the verdict of the jury. Burnett v. Commonwealth, 249 Ky. 112, 60 S. W. (2d) 342; Ray v. Commonwealth, 184 Ky. 800, 212 S. W. 908; Eubank v. Commonwealth, 210 Ky. 150, 275 S. W. 630. Our conclusion is that the newly discovered evidence was not of such a nature as would have had a decisive or any effect on the verdict of the jury.

While appellant admitted that he went with Combs and Riffe to the home of George Barker in the afternoon of the day the homicide was committed, he testified that his purpose in going was to buy a cow. He testified that he returned to Catlettsburg before dark and remained there, and in this he was corroborated by a number of witnesses. He admitted that he was engaged in the illicit sale of liquor at the time, but stated that he had no interest in the still near Barker's home

or any still. There is evidence that, while he and his codefendant were at the home of Barker, one Pat Howard came there with a gun and seemed to be very much exercised over some one molesting a still which he was operating, and there is evidence that some others who accompanied Howard did not come into the house, but that they and Howard in the afternoon or early evening were seen going toward the scene of the tragedy. We deem it unnecessary to go into further or a detailed statement of the evidence for appellant, since notwithstanding the conflict in evidence there was sufficient evidence introduced by the commonwealth to take the case to the jury and to amply support the verdict.

Finding no error in the record prejudicial to appellant's substantial rights, the judgment is affirmed.