## Commonwealth v. Compton.

(Decided May 24, 1935.)

566

BAILEY P. WOOTTON, Attorney General, J. E. CHILDERS, W. A. DAUGHERTY, A. F. CHILDERS, and RAY L. MURPHY and DAVID C. WALLS, Assistant Attorneys General, for appellant.

ED. L. ALLEN and J. P. TACKETT for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Certifying the law.

The appellee and about forty other persons were jointly indicted at the February, 1934, term of the Pike circuit court, being charged with the statutory offense of confederating and banding themselves together for the purpose of intimidating, alarming, or injuring others. At the same term the appellee made a motion for a severance, which the court sustained, and the commonwealth elected to try appellee. The trial proceeded, a jury returned a verdict of guilty, and fixed the punishment at two years' confinement in the penitentiary.

Appellee filed a motion for a new trial. One of the grounds set out was that the court erred in failing to give to the jury the whole law of the case; the court sustained appellee's motion, set aside the verdict and entered an order granting appellee a new trial, to which ruling and entry of order the commonwealth's attorney objected and excepted, and on behalf of the commonwealth prayed and was granted an appeal.

In a written memorandum by the judge of the lower court, it was stated that in his opinion the appellee was entitled to an instruction on the weight and effect to be

given by the jury to the testimony of an accomplice, asserting that the failure to give such an instruction was an oversight on the court's part.

The commonwealth also objected and excepted to the giving of instruction No. 4, which in substance told the jury that appellee and "all persons so desiring" had the right under the law to become members of a labor union, and to peaceably assemble themselves for the purpose of discussing their problems, and that it would not be unlawful for them to meet for the purpose of peaceably requesting or persuading others not to accept or engage in employment supplanting them.

The commonwealth asks for a certification of the law, and "if it can be done" to have this court direct the lower court to set aside the order granting appellee a new trial, the argument being directed solely to the complaints that the court should not give an accomplice instruction, and that instruction No. 4 as given was unauthorized and prejudicial to the commonwealth, because thereby certain facts were singled out and given undue prominence.

This court may not direct the setting aside of the order of the court granting a new trial. It may, nevertheless, certify to a correct exposition of the law. Com. v. Wilson, 215 Ky. 743, 286 S. W. 1065; Com. v. Milburn, 191 Ky. 717, 231 S. W. 502.

It is contended by appellant that the giving of an accomplice instruction would have been error, because the proof did not show that the persons who testified, and whom the court below evidently conceived to have been accomplices, were in fact accomplices within the meaning of section 241 Criminal Code of Practice, and in order to determine that question we must look to the evidence introduced by the commonwealth.

The proof shows that the Edgewater Coal Company had been engaged in mining coal in Pike county; that prior to the incident, out of which grew the indictment of appellee and others, the United Mine Workers of America undertook to organize the employees of the company. There was also another organization commonly known as the Company Union, undertaking to organize the same employees. There was a clash of

opinions and interests between the two organizations, following which the first-named organization called a general strike, which was in effect for two weeks prior to September 18, 1933, and the miners at the Edgewater plant had not undertaken during that time to work the mines, though several of its employees, the mine superintendent, electricians, and others known as salaried men, had been going to the mine, taking with them employees who were qualified as deputy sheriffs, for the purpose of protecting the works and to pump water and remove slate from the mine. The proof shows that appellee, who appears to have been the local president of the United Mine Workers, and a considerable number of union members, assembled on the night of September 17, when it was decided that the nonunion members should not be permitted to work. It was asserted by several who were present at the meeting where appellee presided, and where his brother, who was vice president, addressed the assembly, that those present were told that the miners were proposing to work the next morning, and they should see that the men did not work, and the participants in the meeting were told to assemble at the mine the next morning; that there would be men on the hills armed with rifles to see that nobody went to work. On the next morning the mine foreman, the electrician, and others who had been going to the mine, as they claim, merely to see to the preservation of the property, and not to operate the mine, started as usual to ride up the hill on the supply car, and were waiting for the car to arrive, when appellee and others approached and warned the company's men not to undertake to go up the hill to the mine. They were told that there were men stationed in the hills, "greenhorns" who might shoot if they undertook to ride up on the car. An argument arose and the company men, or some of them, rather insisted that they were going up the hill. Appellee then said, "All you men who have guns line up over there and who ain't line up over there. Nobody is going up the hill, we had just as well have it out one time this morning as another." The men lined up, and from the proof we gather that the company men were ordered to and did disperse.

The proof shows that many of those assembled with appellee (the number is estimated from 100 to 300)

were armed with pistols, shotguns, and rifles, and that appellant and several of his crowd drew their arms.

The above is a sufficient recitation of the proof to furnish approach to the question as to whether some of the witnesses who testified for the commonwealth were or not in fact accomplices, and whether or not the court below should have given the jury an instruction as to the effect of their testimony.

One witness testified that he was at the meeting and the officials said for them all to be there the next morning. He named the officials as being Tony and John Compton, and stated that Tony said: "All you men meet us at five o'clock in the morning to answer for work," and that they did so; that he did not say anything about bringing guns, but that nearly everybody had guns. This witness disclaimed having a gun, but he appears to have been present and among the crowd which he says had been called out. He then describes what took place, and the testimony does not materially differ from that of other of the commonwealth's witnesses. This witness was at that time a member of the United Mine Workers.

Another witness, a member of the United Mine Workers, was present at the meeting. He said that the spokesman told them to be out in line at 5 o'clock the next morning; that they were expecting the men to work and they did not want this done, and for everybody to meet out there at the incline, and they did so the next morning. This witness describes in detail what took place, both at the night meeting and the next morning. He also claims that he was not armed.

Other witnesses testified that they were also at the meeting on the night of September 17. They describe in detail what occurred, and their testimony corresponds with the testimony above detailed. One goes further in one respect, saying that the spokesman told them to bring their guns. Two of these witnesses were present the next morning, and one admitted that he had a gun. Both described in detail what happened at the meeting and at the foot of the incline on the following morning.

A slight analysis of the testimony of those who were present at the night meeting, and confessedly act-

ing under .what they termed official orders, and those present on the morning of the 18th, is sufficient to lead to the conclusion that they were accomplices within the meaning of the law. In Means v. Com., 238 Ky. 366, 367, 38 S. W. (2d) 193, this court said:

"The test for determining whether one is an accomplice is to weigh the evidence showing his participation in or connection with the offense, and to determine from such evidence whether he could be convicted as either a principal or as an aider or abettor. Duke v. Com., 201 Ky. 365, 256 S. W. 725; Crouch v. Com., 201 Ky. 460, 257 S. W. 20.''

In Miller v. Com., 240 Ky. 355, 42 S. W.· (2d) 523, it was held that "an 'accomplice' within the meaning of the Criminal Code of Practice, supra (sec. 241), is one who knowingly, voluntarily, and with common intent with the principal unites in the commission of the crime, either by being present and joining in the criminal act, by aiding and abetting in its commission, or, not being present, by advising and encouraging the act."

See, also, Fox v. Com., 248 Ky. 466, 58 S. W. (2d) 608; Mitchell v. Com., 240 Ky. 258, 42 S. W. (2d) 305, and Poore v. Com., 249 Ky. 665, 61 S. W. (2d) 320, and for a general rule construing section 241 of the Criminal Code of Practice with relation to the duty of the court where the question of testimony of an accomplice is involved, see Fox v. Com., supra.

. The court is of the opinion that the evidence adduced of some of the witnesses brought them into the class of accomplices, and this being so, it was proper for the court under the mandatory provisions of section 241 of the Criminal Code of Practice, to have submitted an instruction embodying the law as thereby stated.·

The question as to the court having properly given an instruction presenting the defense relied upon by appellee is hardly an open question. On the trial the appellee testified that a strike of the United Mine Workers had been called and was in effect; that what he called "scab" miners were coming in to work the next morning, and "we met for the purpose of asking them or persuading them not to come to work; not to take our places." He further says they had no intention of making objection to the salaried men working, or to

object to men working to preserve the mine property, and says "when I went down (the next morning) because we met there for the purpose of asking the men— it had been reported that a lot of 'scabs' were coming in, and we didn't know who it was there, so we went down for the purpose of asking the men in a peaceable way not to go to work there." He denies any responsibility for the presence of or knowledge of the personnel of the men in the hills armed with firearms. As to what happened at the incline, he says that he told the men at the foot of the hill that for their safety, on account of a rumor that armed men were in the hills, they had better go down the road, and he says he told the armed men that they "had better take their arms and go back home," and he, appellee, went on home. He denies that there were any threats of violence, and in fact makes it appear that his mission and his efforts were peaceable and of persuasive character only, and in these matters he is borne out by other witnesses who testified for him.

In the state of case presented here, it was proper for the court to present to the jury by way of appropriate instruction any defense presented by the appellee. As a matter of right, members of a labor union may assemble and agree to pursue, and pursue any legal means to gain their ends; that is, to use persuasive powers in a peaceable way to induce others to join their organization, or by the same means to persuade others not to take their jobs, but in doing so they must keep within legal bounds. They may not transgress the law; "the acts permitted must not be carried to the extent of violating the statute involved in this case." Alsbrook v. Com., 243 Ky. 814, 816, 50 S. W. (2d) 22. In this case, which involved a prosecution under section 1241a-1, Ky. Stats., the same under which the indictment herein was drawn, this court wrote at length and quite conclusively on the subject under discussion, saying:

"The instructions, however, should leave no room for cavil, but should distinctly and definitely delineate the rights of both the defendant and the commonwealth."

The Alsbrook Case, supra, is strikingly similar to this case, in so far as the proof is concerned. The only difference noted being that in this case the appellee is

shown to have been at the meeting the night before the occurrences of September 18. The same may be said as to the case of Newton v. Com., 244 Ky. 41, 50 S. W. (2d) 18, with the same possible difference as to facts. It is suggested that, on another trial, if the facts should be the same, the court should give substantially the following instruction:

"You are further instructed that the defendant and his associates had the right to assemble themselves together for the purpose of advising and discussing with each other as to lawful and peaceful plans to protect their interests and rights, and defendant, and such others had the right in pursuance of such plans to assemble for the purpose of persuading and inducing others, in a peaceable manner, to regard their rights, or to request others not to displace or supplant them in their employment, and if you believe from the evidence that the defendant was present on the occasion in question, solely for the purpose of peaceably persuading, and undertook only to so persuade other persons not to work or take the places of striking miners, and did not do so in pursuance of a conspiracy to intimidate, alarm or disturb them, or any of them in the manner and by the means set out, and defined in instruction No. 2, you will find him not guilty."

Law certified.